UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT GEORGE, MICHAEL
CURVIN, ZEF ZEKA, PAUL
LEDOUX and ERIK PAIVA,
Individually and on Behalf
of Others Similarly Situated,
    Plaintiffs,

     v.                                    CIVIL ACTION NO.
                                          10-10289-NMG

NATIONAL WATER MAIN CLEANING
CO. and CARYLON CORP.,
    Defendants.

**MEMORANDUM AND ORDER:
PLAINTIFF'S MOTION TO AMEND THE FIRST
CLASS ACTION COMPLAINT
(DOCKET ENTRY # 23)**

**REPORT AND RECOMMENDATION RE:
CARYLON CORP.'S MOTION TO DISMISS AMENDED COMPLAINT
(DOCKET ENTRY # 16)**

**March 7, 2011**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss the first amended complaint (Docket Entry # 6) filed by defendant Carylon Corporation ("Carylon"). (Docket Entry # 16). After Carylon filed the motion to dismiss, plaintiffs Robert George and Michael Curvin ("plaintiffs") filed a motion to amend the first amended complaint (Docket Entry # 23) and attached a proposed second

amended complaint (Docket Entry # 23, Ex. 1).[1]

The first amended complaint imposes liability on Carylon for violations of Massachusetts wage and overtime statutes. Carylon moves to dismiss these claims on the basis that it is not plaintiffs' employer under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"). (Docket Entry # 16). Aside from relatively minor factual differences between the first and second amended complaints, the second amended complaint does not include additional, material facts relative to Carylon's role or status as an employer. (Docket Entry # 25, n.1).

The motion to amend the first amended complaint seeks to: (1) add eight more plaintiffs including individuals performing work in Connecticut and Rhode Island;[2] (2) add six counts alleging violations of Connecticut and Rhode Island wage and overtime statutes; (3) add a count against defendant National Water Main Cleaning Company ("NWMC") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"); and (4) add a second RICO count against

---

[1] Since the filing of the motion to amend, this court allowed two motions to amend seeking only to add the following plaintiffs: Zef Zeka, Paul Ledoux and Erik Paiva.

[2] The additional plaintiffs are Mark Bassett, Kevin Colvin, Kevin Freeman, Justin Kordas, Carlos Villarreal, Paul Dockett, Jon Eldridge and Chris Myers.

three individuals[3] for violations of 18 U.S.C. § 1962(c)

("section 1962(c)").  (Docket Entry # 23).

NWMC, Carylon and the individual RICO defendants

("defendants") oppose the motion to amend on the basis that the

third and fourth items, i.e., the RICO claims, are futile.

(Docket Entry # 25).  Upon inquiry at the October 14, 2010

hearing, there was no objection to the addition of the first two

items.  This court therefore allowed the motion to amend as to

these items at the hearing.[4]  At the conclusion of the hearing,

this court took the motion to amend (Docket Entry # 23) and the

motion to dismiss (Docket Entry # 16) under advisement.[5]  The

---

[3] The individuals are defendants Davis Sullivan
("Sullivan"), vice president of NWMC and head of the company's
Canton, Massachusetts office; Antonino LaFrancesca
("LaFrancesca"), the Canton office manager; and Carl Cummings
("Cummings"), a former accountant for the Canton office.
Sullivan, LaFrancesca and Cummings are referred to as the
individual defendants.

[4] Although Carylon did not voice an objection at the
hearing to the addition of the Connecticut and Rhode Island wage
claims, it clearly did so in the opposition to the motion to
amend.  (Docket Entry # 25, n.1).  Out of an abundance of
caution, this court therefore addresses Carylon's argument which
is the same argument it poses in seeking to dismiss the
Massachusetts wage claims, to wit, it is not plaintiffs'
employer.

[5] Insofar as the motion to amend that seeks to add two new
counts under RICO and new parties, this court has "the authority
to decide the motion to amend outright" under 28 U.S.C. §
636(b)(1)(A).  Maurice v. State Farm Mutual Automobile Insurance
Co., 235 F.3d 7, 9 n.2 (1st Cir. 2000) (addressing motion for
leave to file amended complaint to add a new count); accord Schur

motions are therefore ripe for review.


I. MOTION TO DISMISS FIRST AMENDED COMPLAINT (DOCKET ENTRY # 16)

Plaintiffs initially filed this suit individually and on behalf of other similarly situated individuals against Carylon and NWMC in Massachusetts Superior Court (Norfolk County). Asserting subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1332, Carylon and NWMC removed the action to the United States District Court in the District of Massachusetts.

The first amended complaint includes claims against Carylon and NWMC for violations of: (1) sections 26 to 27 of Massachusetts General Laws chapter 149 ("chapter 149") for improperly classifying plaintiffs as laborers rather than higher paying classifications such as clam shell workers; paying a shop rate in lieu of a higher paying "on the job" rate; and improperly taking certain employee benefit deductions from wages (Count 1); (2) section 1(A) of Massachusetts General Laws chapter 151 ("chapter 151") for not paying a higher overtime rate for overtime work and instead using the lower shop rate (Count 2);

_____

v. L.A. Weight Loss Centers, Inc., 577 F.3d 752, 760 n.6 (7th Cir. 2009) ("[w]e have determined that a motion to amend is nondispositive, even where the ruling may prevent joining a defendant"); Hall v. Norfolk Southern Ry. Co., 469 F.3d 590, 595 (7th Cir. 2006); see Deberry v. Davis, 2010 WL 1610430, *7 n.8 (M.D.N.C. April 19, 2010); see, e.g., Uhlein v. County of Jefferson, 2005 WL 928619, *4 n.11 (N.D.N.Y. April 20, 2005).

4

and (3) section 148 of chapter 149 for not paying plaintiffs correct wages (Count 3). (Docket Entry # 6, ¶¶ 72-88; Docket Entry # 23, Ex. 1, ¶¶ 147-163).[6]

The second amended complaint adds similar claims against Carylon and NWMC under analogous Connecticut and Rhode Island statutes. (Docket Entry # 23, Ex. 1, ¶¶ 164-195). In particular, the second amended complaint sets out claims against Carylon for violations of Connecticut and Rhode Island wage statutes (Connecticut General Statutes sections 31-53[7] and 31-71b and Rhode Island General Laws 37-13-3 and 37-13-7) and Connecticut and Rhode Island overtime statutes (Connecticut General Statute section 31-76c and Rhode Island General law 37-13-10).

The common denominator for all these wage and overtime statutes is that they impose liability on an "employer." See Weems v. Citigroup Inc., 900 N.E.2d 89, 92 (Mass. 2009) (brackets in original) ("G.L. c. 149, § 148, provides: '[Employers] shall pay weekly or bi-weekly each such employee the wages earned by

---

[6] For convenience, this court adds the corresponding references to the second amended complaint inasmuch as Carylon opposes amendment of similar statutory claims in the second amended complaint.

[7] The Senate and House of Representatives in the Connecticut General Assembly enacted a bill to repeal section 31-53, as amended by section one of public act 10-47, and to enact a revised statute effective October 1, 2010.

him' . . . and . . . employer who violates the act is subject to
possible civil and criminal penalties, injunctive relief, treble
damages, and attorney's fees and costs"); Cox v. Truck Services,
Inc., 2002 WL 765460, *3 (Mass.Super. April 26, 2002) (allowing
summary judgment on claim for violating sections 26 and 27 of
chapter 149 for related corporation that was not the plaintiff's
employer); Mass. Gen. L. ch. 151, § 1A ("[e]xcept as otherwise
provided in this section, no employer in the commonwealth shall
employ any of his employees . . . for a work week longer than
forty hours"); Conn. Gen. Stat. § 31-53 ("[e]ach employer subject
to the provisions of this section or section 31-54 shall . . .
submit monthly to the contracting agency" indicating wage rates
"are not less than the prevailing rate of wages" and that "the
employer has complied with the provisions of this section and
section 31-54"); Conn. Gen. Stat. § 31-72 ("[w]hen an employer
fails to pay an employee wages in accordance with the provisions
of sections 31-71a to 31-71i, inclusive, . . ., such employee . .
. may recover, in a civil action"); Conn. Gen. Stat. § 31-76c
("[n]o employer . . . shall employ any of his employees for a
workweek longer than forty hours"); R.I. Gen. Laws, §§ 37-13-3,
37-13-7 and 37-13-10.[8]

---

[8] With respect to the Rhode Island statutes, this court
assumes a private right of action exists. See R.I. Gen. Laws, §
37-13-17; but cf. Kun v. M L Restaurants, LLC, 2010 WL 4009102,
*1 (D.R.I. Oct. 12, 2010); Hauser v. Rhode Island Dep't of
Correction, 640 F.Supp.2d 143 (D.R.I. 2009). Carylon does not

Carylon, the parent company of NWMC, therefore moves to dismiss the Massachusetts wage claims in the first amended complaint on the basis that plaintiffs are not employees of Carylon. Rather, they are employees of NWMC, according to Carylon. Carylon opposes the second amended complaint to add the foregoing Connecticut and Rhode Island wage claims for the same reason. Plaintiffs maintain liability exists under a joint employer theory, a piercing the corporate veil theory and/or unjust enrichment.

## STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well established. To survive a motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof of the facts is improbable. <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555-558 (2007). While "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that

---

raise the issue which is therefore waived for purposes of resolving the pending motions. Carylon also assumes that the wage and overtime statutes apply to employers. The issue of the Connecticut and Rhode Island statutes application only to an employer is therefore also waived for purposes of resolving the pending motions. <u>See</u> LR. 7.1(b); <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed"); <u>see</u>, <u>e.g.</u>, <u>In re Pharmaceutical Industry Average Wholesale Price Litigation</u>, 588 F.3d 24, 31, (1st Cir. 2009).

a defendant has acted unlawfully." Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks omitted).

In conducting this review, it is appropriate to consider "'documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint.'" Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009) (quoting Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)). Although a number of exhibits attached to plaintiffs' and Carylon's filings fall into these categories (Docket Entry # 21, Ex. 1-4; Docket Entry # 18, Ex. 1-2), the handbook and related documents (Docket Entry # 21, Ex. 5-7) do not and, as such, are not included in the Rule 12(b)(6) record. "[A]ccepting as true all well-pleaded facts in the complaint and making all reasonable inferences in the plaintiff's favor," Boroian v. Mueller, 616 F.3d 60, 64 (1st Cir. 2010), the "factual allegations 'must be enough to raise a right to relief above the speculative level.'" Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010). Eschewing reliance on "'bald assertions, . . . unsubstantiated conclusions,'" Fantini v. Salem State College, 557 F.3d 22, 26 (1st Cir. 2009), and legal conclusions, see Dixon v. Shamrock Financial Corp., 522 F.3d 76, 79 (1st Cir. 2008) (rejecting "'unsupported conclusions or interpretations of law'" in reviewing Rule 12(b)(6) dismissal), the first amended

complaint sets out the following facts.

FACTUAL BACKGROUND[9]

NWMC and Carylon "employ workers" to perform a wide range of sewer cleaning services "pursuant to municipal contracts." (Docket Entry # 6, ¶ 22).  Carylon is the parent company of NWMC, which is a wholly owned subsidiary of Carylon.  NWMC "operates a facility in Canton, Massachusetts" and provides plumbing as well as "drain and sewer cleaning services in Massachusetts and other states."  (Docket Entry # 6, ¶ 5).

Carylon is headquartered in Chicago, Illinois.  The company has numerous wholly owned subsidiaries across the United States.  These subsidiaries, which include NWMC, perform "environmental remediation services under municipal contracts."  (Docket Entry # 6, ¶ 6).

Plaintiffs are employees of NWMC.  Specifically, NWMC employs plaintiffs as "catch basin removal services heavy equipment operators[s]."  (Docket Entry # 6, ¶¶ 3-4).  "NWMC workers operate 'clam shell' trucks and 'vac haul' trucks" under "wage contracts."[10]  (Docket Entry # 6, ¶ 37).  NWMC included

---

[9]  Citations to the first amended complaint and the documents properly considered part of the Rule 12(b)(6) record are provided only for direct quotations.

[10]  The first and second amended complaints refer to "prevailing wage contracts."  Adding the adjective "prevailing"

9

pictures of the trucks it uses in a filing made during an investigation by the Massachusetts Attorney General in response to plaintiffs' administrative complaints. (Docket Entry # 6, ¶ 21; Docket Entry # 23, Ex. 1, ¶ 34; Docket Entry # 28, Ex. 3(A)). NWMC has at least one contract with a public works department, to wit, the Massachusetts Highway Department.

NWMC has a number of payroll policies and procedures which it uses to avoid paying plaintiffs and other employees certain wages. For example, "NWMC has a practice" of altering its payroll to pay an employee a shop rate when equipment breaks down at a job site. (Docket Entry # 6, ¶¶ 40-41; Docket Entry # 23, Ex. 1, ¶¶ 63-64). During the time it takes to fix the equipment, NWMC pays the employee the lower shop rate rather than the higher "on the job" rate. The company also pays employees the shop rate to drive from the Canton office to a work site.

NWMC also has a practice or procedure of paying workers less than the overtime rate for work in excess of a 40 hour work week. NWMC uses the shop rate to calculate the overtime rate thereby

---

changes the above factual allegation into a conclusion of law, to wit, that the wages fall within the scope of the prevailing wage law. See generally Mullally v. Waste Management of Massachusetts, Inc., 895 N.E.2d 1277, 1281 & n.11 (Mass. 2008) (discussing "the prevailing wage statute" and the "overtime statute"); Teamsters Joint Council No. 10 v. Director of Dept. of Labor and Workforce Development, 849 N.E.2d 810, 815 (Mass. 2006) (similar). This court therefore omits the adjective "prevailing" from the factual background.

resulting in a reduced hourly rate.

In addition, NWMC regularly classifies its workers as laborers when they operate clam shell trucks rather than the higher paying classification for "'clam shells/slurry buckets/heading machines.'" (Docket Entry # 6, ¶ 37; Docket Entry # 23, Ex. 1, ¶ 59). Even when NWMC classifies its workers as laborers, NWMC pays such workers less than the laborer rate of pay "in most if not all cases" (Docket Entry # 23, Ex. 1, ¶ 60) thus making this a regular policy or procedure.

NWMC deducts an excess amount of a prorated hourly cost that it incurs for health and benefit contributions from an employee's hourly wage rate. As a result, NWMC pays its employees a lower hourly wage rate.

In sum, NWMC engages in activities of altering the daily and weekly payroll, not properly calculating overtime wages, failing to take into account travel time and deducting certain employee benefits from wages. These activities took place on a regular, repeated and/or consistent basis.[11]

---

[11] The first and second amended complaint describe the violations as "repeated" at various points and employ the word "practice" to denote certain misconduct. (Docket Entry # 6, ¶¶ 40, 75, 76, 81, 82, 86 & 87; Docket Entry # 23, Ex. 1, ¶¶ 63, 150, 151, 156, 157, 161, 162, 166, 167, 172, 173, 177, 178, 182, 183, 188, 189, 193 & 194). As such, the misconduct is sufficiently ingrained to constitute a policy or regular procedure at NWMC.

Notably, Carylon is mot a mere bystander to these procedures. Rather, "Carylon exercises direct control over NWMC's management and either controls, or has knowledge of, NWMC's payroll and personnel policies and procedures." (Docket Entry # 6, ¶ 7; Docket Entry # 23, Ex. 1, ¶ 16). Carylon's "direct control" over NWMC's "policies and procedures" extends to:

> 1) the manner in which NWMC classifies and pays employees who work on contracts . . . ; 2) the manner in which NWMC calculates overtime for its employees who work on contracts . . . ; and 3) the manner in which NWMC calculates which health and welfare benefits may be deducted . . ..

(Docket Entry # 6, ¶ 7; Docket Entry # 23, Ex. 1, ¶ 16).

Carylon's website lists updated job postings for jobs at NWMC and other wholly owned subsidiaries. Carylon administers and promulgates a stock ownership plan for the employees of subsidiaries including NWMC. Carylon represents itself as guaranteeing the work of NWMC and other Carylon companies. In December 2009, plaintiffs received a memorandum addressed to all employees of Carylon. Carylon's website depicts the equipment and employees of its wholly owned subsidiaries as its own equipment and employees. NWMC's Canton office is denoted as a Carylon location on Carylon's website. NWMC and Carylon together "improperly classify certain workers" as laborers. (Docket Entry # 6, ¶ 35; Docket Entry # 23, Ex. 1, ¶ 54). NWMC's President is a vice president of Carylon.

Carylon directly profits from the reduced wages paid to NWMC employees. The December 2009 memorandum plaintiffs and other NWMC employees received from Carylon's President notes that Carylon "remains profitable" in the wake of the economic crises "due to your hard work." (Docket Entry # 6, ¶ 14; Docket Entry # 23, Ex. 1, ¶ 23).

Plaintiffs each filed an administrative complaint with the Massachusetts Attorney General. The complaints identify NWMC as plaintiffs' employer. They do not reference or mention Carylon.[12]


## DISCUSSION

Carylon moves to dismiss all the claims against it because it was not plaintiffs' employer under any theory including one based on piercing the corporate veil or a joint employer. As to the latter theory, Carylon also contends that it is not liable because the allegations are bereft of any wrongdoing based on Carylon's own actions as distinguished from the actions of NWMC. Carylon additionally argues that the Massachusetts wage statutes preempt the unjust enrichment claim. Plaintiffs submit inter alia that Carylon is their employer or otherwise liable under a

---

[12] Carylon argues that the statements are dispositive admissions. According to Carylon, the statements show that plaintiffs were not confused or misled about the relationship between Carylon and NWMC.

piercing the corporate veil or a joint employer theory.[13]

A.   Piercing Corporate Veil

"Under Massachusetts law, disregarding separate corporate

entities is the exception, not the rule."   Hiller Cranberry

Products, Inc. v. Koplovsky Foods, Inc., 165 F.3d 1, 10 (1st Cir.

1999); see Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996)

(in Massachusetts, corporate veils are pierced only "in rare

situations"); Evans v. Multicon Construction Corp., 574 N.E.2d

395, 398 (Mass.App.Ct. 1991) (piercing permissible "in 'rare

particular situations to prevent gross inequity'").   The decision

of My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748

(Mass. 1968), sets forth the applicable standard.   See Cox v.

Truck Services, Inc., 2002 WL 765460, *3 (Mass.Super. April 26,

2002) (applying My Bread Baking in context of allowing summary

judgment motion for related corporation that owned trucks and had

overlapping officer with respect to its liability under section

27 of chapter 149); see also Attorney General v. M.C.K., Inc.,

736 N.E.2d 373, 380 (Mass. 2000) (recognizing that "the doctrine

may also properly be used to carry out legislative intent and to

avoid evasion of statutes").

_____

[13]   Carylon does not argue that the wage statutes at issue
do not apply to employers.  As explained in footnote seven, such
an argument is therefore waived.

As expressed by the Massachusetts Supreme Judicial Court ("SJC") in <u>My Bread</u>, the common ownership of stock together with common management, standing alone, does not give "rise to liability on the part of one corporation for the acts of another corporation." <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 233 N.E.2d at 751-752. Thus, although NWMC is a wholly owned subsidiary of Carylon and there is common management to the extent of an overlapping corporate officer, "additional facts" are required to impose liability. <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 233 N.E.2d at 752.

The SJC in <u>My Bread</u> set out general principles to assess whether to disregard the entities of two, separately formed corporations. Disregarding two corporate entities with common stock and management is particularly apt:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

<u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 233 N.E.2d at 752; <u>accord</u> <u>Birbara v. Locke</u>, 99 F.3d at 1238 (same); <u>Evans v. Mullion</u>

Construction Corp., 574 N.E.2d at 398 (same); Cox v. Truck

Services, Inc., 2002 WL 765460, *3 (Mass.Super. April 26, 2002)

(same).

    Relevant factors in conducting the analysis:

> are (1) common ownership; (2) pervasive control; (3)
> confused intermingling of business assets; (4) thin
> capitalization; (5) nonobservance of corporate formalities;
> (6) absence of corporate records; (7) no payment of
> dividends; (8) insolvency at the time of the litigated
> transaction;[14] (9) siphoning away of corporation's funds by
> dominant shareholder; (10) nonfunctioning of officers and
> directors; (11) use of the corporation for transactions of
> the dominant shareholders; and (12) use of the corporation
> in promoting fraud.

Attorney General v. M.C.K., Inc., 736 N.E.2d at 381 n.19; accord

Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 128 (1st Cir.

2006) (quoting M.C.K., Inc., 736 N.E.2d at 381 n.19); Evans v.

Multicon Const. Corp., 574 N.E.2d at 398.

    Although the issue is close, particularly in light of the

Platten and Cox decisions, the factual allegations suffice to set

out a plausible claim to impose liability on Carylon.  Carylon

controlled NWMC's payroll policies and procedures including the

manner in which NWMC classified and paid its employees in

municipal contracts.  Both "NWMC and Carylon" falsified the job

classifications of "their workers."  (Docket Entry # 6, ¶ 34;

---

[14]  The first amended complaint does not identify any thin
capitalization or insolvency.  To the contrary, the company
remained profitable in 2009.

Docket Entry # 23, Ex. 1, ¶ 53). Carylon also controlled "the manner in which NWMC "calculate[d] which health and welfare benefits" are deducted from the wage rate of NWMC employees. (Docket Entry # 6, ¶ 7; Docket Entry # 23, Ex. 1, ¶ 16). The control exercised by Carylon in the case at bar, which also extends to NWMC's overtime calculations, is more pronounced than the control the parent corporation exercised in <u>Platten</u> notwithstanding the similarities of the expectation that a parent company will share in a subsidiary's profits and that individuals will serve as directors or officers of both a parent and a subsidiary and thereby act on behalf of one or the other company at different times. <u>See</u> <u>Platten v. HG Bermuda Exempted Ltd.</u>, 437 F.3d at 129 (affirming allowance of motion to dismiss).

Carylon's direct control over the classification, the calculation of employee health and welfare benefit deductions and the calculation of overtime by NWMC also distinguish this case from <u>Cox</u>. The factual allegations that support veil piercing are more than any inferred inference that Carylon owned NWMC equipment and had an officer that was president of NWMC. <u>Cf. Cox v. Truck Services, Inc.</u>, 2002 WL 765460, *1-4 (allowing summary judgment in favor of related corporation for liability under Massachusetts wage statutes notwithstanding its ownership of the

other corporation's equipment, overlapping officer and misrepresentation by related corporation's President).  Indeed, the facts in the first amended complaint show a significant amount of control exercised by Carylon over NWMC's payroll practices, classifications of employees and calculations of overtime and health and welfare benefit deductions.

The fact that plaintiffs named NWMC as their employer in their administrative complaints undeniably weakens plaintiffs' piercing the corporate veil theory.  On the other hand, an employee is not required to name all related parties when filing an administrative complaint under section 148 of chapter 150. See Nahigian v. Leonard, 233 F.Supp.2d 151, 164 (D.Mass. 2002) (characterizing complaint as "adequate, even if it does not name all the related parties who will be sued," as "long as it describes the substance of the crime (non-payment of wages)" in context of discussing exhaustion of administrative remedies).[15]

_____

[15]  In greater length, the Nahigian court explained that:

The purpose of the Section 150 complaint must be different, because in Section 150, unlike in Chapter 151B, there is no requirement that the administrative agency receiving the complaint actually investigate the charges made.  Dunfey, 2002 WL 388196 at *2.

Indeed, the purpose of Section 150's administrative requirement, rather than giving potential defendants notice

Although the administrative complaints indicate a lack of confusion, plaintiffs' receipt of the memorandum addressed to all employees of Carylon, the stock ownership plan administered by Carylon and other factual allegations lend support in favor of piercing.  Further, the injurious consequences of Carylon's conduct in controlling NWMC's classifications, overtime calculations and health and welfare benefit deductions do not serve the purpose of the wage statutes.  See generally Camara v. Attorney General, 2011 WL 198644, *3 (Mass. Jan. 25, 2011) (purpose of section 148 of chapter 149 "is 'to protect employees and their right to wages'"); Boston Police Patrolmen's

---

and an opportunity to conciliate, seems to be to give the Attorney General notice that a crime (failure to pay wages) may be occurring.  Id.  Thus, a "more lenient standard of scrutiny" can be used for assessing the naming of related parties:  the complaint is adequate, even if it does not name all the related parties who will be sued, so long as it describes the substance of the crime (non-payment of wages) that has been committed.  Id.  This approach is particularly sensible when one considers that the Section 148/150 complaint form does not indicate that a plaintiff list all potential parties to a suit, but asks only for an employer and the manager and president of that employer.  Id. at *3, n.3.  Since Nahigian filed an initial complaint in this case and appears to have described the substance of the crime, the failure to name Byrd and Tvrdik does not mandate dismissal of the action against them.

Nahigian v. Leonard, 233 F.Supp.2d at 164.

Association Inc. v. City of Boston, 761 N.E.2d 479, 481 (Mass. 2002) ("purpose of the weekly wage law is clear: to prevent the unreasonable detention of wages").

In sum, the factual allegations are sufficient to hold Carylon liable under a piercing the corporate veil theory to withstand the motion to dismiss.

B.  Joint Employer

Having made an adequate showing to avoid dismissal based on piercing the corporate veil, it is not necessary to determine whether the joint employer theory also leads to the survival of the same claims.  It is nonetheless worth noting that the cases plaintiffs and Carylon cite to address the joint employer theory all involve interpretations of employer status under federal discrimination statutes.[16]  See Engelhardt v. S.P. Richards Co., Inc., 472 F.3d 1 (1st Cir. 2006) (Family and Medical Leave Act); Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico, 929 F.2d 814 (1st Cir. 1991) (Age Discrimination in Employment

---

[16]  Massachusetts adheres to a formulation of joint employer liability under Massachusetts General Laws chapter 151B, see Commodore v. Genesis Health Ventures, Inc., 824 N.E.2d 453, 456 (Mass.App.Ct. 2005), and in other contexts.  See Williams v. Westover Finishing Co., Inc., 506 N.E.2d 166, 168 (Mass.App.Ct. 1987) ("[j]oint employment, where a person under the simultaneous control of two employers simultaneously performs services for both, is a well recognized phenomenon") (interpreting statutory waiver of common law wrongful death action under workmen's compensation statute).

Act); <u>Orell v. UMass Memorial Medical Center, Inc.</u>, 203 F.Supp.2d
52 (D.Mass. 2002) (Americans with Disabilities Act and Age
Discrimination in Employment Act).  A more appropriate analogy is
to the Fair Labor Standards Act.  <u>See</u> <u>Mullally v. Waste
Management of Massachusetts, Inc.</u>, 895 N.E.2d 1277, 1281 (Mass.
2008) (section 1A of chapter 151 "was intended to be essentially
identical to the Fair Labor Standards Act of 1938 (FLSA), 29
U.S.C. § 207(a)(1) (2000)") (internal quotations marks omitted);
<u>see</u> <u>generally</u> <u>Baystate Alternative Staffing, Inc. v. Herman</u>, 163
F.3d 668, 675 (1st Cir. 1998) ("FLSA contemplates several
simultaneous employers, each responsible for compliance with the
Act").

Carylon's additional argument that the first amended
complaint fails to allege wrongful acts on the part of Carylon
overlooks a number of acts that Carylon allegedly committed.  For
example, "NWMC and Carylon . . . falsify their workers' . . .
classifications" and, in particular, "NWMC and Carylon improperly
classify certain workers who worked on municipal contracts as
'laborers.'"  (Docket Entry # 6, ¶¶ 34-35).  Although it is not
necessary to address this argument, the foregoing allegations and
other factual allegations in the first amended complaint suffice
to defeat the argument.

C.  <u>Unjust Enrichment</u>

Carylon asserts in a footnote that the Massachusetts wage and overtime statutes create exclusive statutory rights and that "[p]laintiffs cannot perform an end-run around the specific statutory remedies and recast their statutory allegations . . . into a common law 'unjust enrichment' claim." (Docket Entry # 17, n.2). Although difficult to decipher due to the brevity of the presentation, one of the two cases Carylon cites presents the issue as a preemption argument. Crevier v. Town of Spencer, 600 F.Supp.2d 242, 265 (D.Mass. 2008) ("where the employee is terminated for exercising her statutory right, and the statute provides the employee with a statutory remedy for that type of retaliatory termination, the statutory remedy *preempts* the common-law wrongful-discharge claim") (emphasis added). Plaintiffs likewise interpret the argument as asserting preemption. Citing Spears v. Miller, 2006 WL 2808145 (Mass.App.Div. Sept. 26, 2006), plaintiffs maintain that the argument lacks merit.

The Spears court rejected an argument that the overtime statute set forth in section 1A of chapter 151 preempts a common law breach of contract claim. The following reasoning in Spears applies equally to the reach of the Massachusetts wage and overtime statutes in the case at bar:

> when our Legislature intends to make a statutory remedy exclusive, it has done so by explicit language. Such language is conspicuously absent from G.L. c. 151, §§ 1A and 1B. See Lowry v. Klemm, 446 Mass. 572, 579-580, 845 N.E.2d

1124 (2006) (exclusivity provisions of G.L. c. 151B, § 9 and
c. 214, § 1C prohibit plaintiffs from framing sexual
harassment as violation of other statutes or as common law
claim); <u>King v. Driscoll</u>, 418 Mass. 576, 584, 638 N.E.2d 488
n.7 (1994)(G.L. c. 151, § 9(1) provides that statutory
redress for employment termination in violation of public
policy is exclusive).  This Division is not inclined to read
G.L. c. 151, §§ 1A and 1B as preempting all common law
claims for unpaid overtime wages without a clear mandate
from the Legislature to do so.

<u>Spears v. Miller</u>, 2006 WL 2808145, *2.

     That said, the <u>Spears</u> court dismissed the unjust enrichment
claim.  It did so, however, on different grounds, specifically,
the existence of an adequate remedy at law.  <u>See</u> <u>Spears v.
Miller</u>, 2006 WL 2808145, *3 (when "adequate remedy at law exists,
a plaintiff may not pursue a claim of unjust enrichment").
Carylon's brevis presentation does not adequately raise an
argument that the existence of a remedy at law bars a remedy for
an unjust enrichment claim in equity.[17]  <u>See</u> LR. 7.1(b); <u>Higgins
v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d at 260.

     Accordingly, the argument, as presented by Carylon, does not
provide a basis to dismiss the unjust enrichment claim.


II.  <u>MOTION TO AMEND FIRST AMENDED COMPLAINT (DOCKET ENTRY # 23)</u>

     Plaintiffs move to amend the first amended complaint to

_____

    [17]  The two cases Carylon cites, <u>Pooler v. U.S.</u>, 127 F. 519,
520 (1st Cir. 1904), and <u>Crevier v. Town of Spencer</u>, 600
F.Supp.2d 242, 265 (D.Mass. 2008), also do not set out the
argument.

23

include inter alia a RICO claim against NWMC under section 1962(a)[18] and a RICO claim against the individual defendants under section 1962(c). (Docket Entry # 23). Defendants argue that the RICO claims are futile. (Docket Entry # 25).

Carylon also opposes the motion insofar as it adds wage and overtime claims under the Connecticut and Rhode Island statutes. In particular, Carylon incorporates by reference the arguments it makes in the motion to dismiss into its opposition to the motion to amend.[19] (Docket Entry # 25, n.1).

It is well settled that futility constitutes an adequate basis to deny amendment. See U.S. ex rel. Gagne v. City of

---

[18] Defendants mistakenly construe the second amended complaint as alleging a section 1962(c) claim against NWMC, the alleged enterprise. They submit that any such claim is futile because section 1962(c) imposes liability on a "person" and a corporation cannot be both a person and an enterprise. (Docket Entry # 25, § I(C)). Plaintiffs do not challenge the argument and represent they are only asserting a section 1962(a) claim against NWMC. (Docket Entry # 28, n.2). The allegations in the second amended complaint support plaintiffs' position. (Docket Entry # 23, Ex. 1, ¶¶ 1 & 2). Hence, the second amended complaint only alleges a RICO claim against NWMC under section 1962(a).

[19] Carylon presents no Connecticut or Rhode Island law or argument that: (1) the statutes at issue impose liability only on an employer; or (2) Connecticut and Rhode Island common law adhere to the same or similar standard of corporate liability for a subsidiary's misconduct. Accordingly and as previously indicated, the arguments are not addressed because of the failure to comply with LR. 7.1(B)(2) and/or a waiver for present purposes. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.

Worcester, 565 F.3d 40, 48 (1st Cir. 2009) (reasons to deny leave to amend "include undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility of amendment"); Maine State Building and Construction Trades Council, AFL CIO v. United States Department of Labor, 359 F.3d 14, 19 (1st Cir. 2004). Where, as here, defendants did not file a summary judgment motion before plaintiffs sought amendment, the applicable standard to gauge futility is the standard that "applies to motions to dismiss under Fed.R.Civ.P. 12(b)(6)." Adorno v. Crowley Towing And Transp. Co., 443 F.3d 122, 126 (1st Cir. 2006). The previously described standard of review applicable to the motion to dismiss (Docket Entry # 16) therefore applies to the motion to amend (Docket Entry # 23). Having summarized the underlying facts to a degree, this court turns to the arguments. Additional facts are set forth where relevant.

A. Section 1962(c) Claim

Defendants first move to dismiss the section 1962(c) claim against the individual defendants. Count 13 of the second amended complaint sets out the section 1962(c) allegations that the individual defendants engaged in a pattern of racketeering through the enterprise of NWMC. The alleged predicate acts consist of mail fraud violations under 18 U.S.C. § 1341.

Defendants submit that plaintiffs do not sufficiently allege

that the predicate act[s] directly and proximately caused their

injury. "Section 1964(c) requires that the defendant's specified

acts of racketeering were the proximate cause of the plaintiffs'

injuries." George Lussier Enterprises, Inc. v. Subaru of New

England, Inc., 393 F.3d 36, 51 (1st Cir. 2004) (citing Holmes v.

Securities Investor Protection Corp., 503 U.S. 258, 268 (1992)).

The section 1962(c) claim is therefore subject to dismissal if

the plaintiffs' "injuries are so far removed from the defendant's

acts that they are indirect and derivative." Id.

The alleged scheme consists of the use and submission of

incorrect and "falsified weekly payroll certifications and

statement of compliance forms" through the United States mail to

the municipalities under contract with NWMC. (Docket Entry # 23,

Ex. 1, ¶ 94). NWMC entered into numerous municipal contracts

with various Massachusetts, Connecticut and Rhode Island towns

and submitted false payroll certifications and compliance forms

to such towns.[20]

In Massachusetts, municipal contracts awarded by public

officials or public bodies covering "mechanics and apprentices,

teamsters, chauffeurs and laborers" performing construction of

public works, are subject to a statutory scheme governing wage

---

[20] The second amended complaint identifies by name 95
Massachusetts towns, two Connecticut towns and one Rhode Island
town.

rates and job classifications.[21]  Mass. Gen. L. ch. 149, § 27;

see Mass. Gen. L. ch. 149, § 26; see also Teamsters Joint Council

No. 10 v. Director of Dept. of Labor and Workforce Development,

849 N.E.2d 810, 813 (Mass. 2006) (describing statutory scheme of

chapter 149 and addressing coverage for travel time).  Pursuant

to chapter 149, the Director of the Massachusetts Department of

Labor ("the Commissioner") maintains a list classifying "jobs

usually performed on various types of public works."  Mass. Gen.

L. ch. 149, § 27.  The public official or public body wishing to

undertake a public works project initially submits a list of the

various jobs for the project to the Commissioner.  The

Commissioner then sets the wage rates for the jobs and provides a

schedule of such rates.  The wage rates in the schedule "shall

include the amount of payments by employers to health and welfare

plans, pensions plans and supplemental unemployment benefit

plans."[22]  Mass. Gen. L. ch. 149, § 27.  The schedule is

thereafter incorporated into the contract with the awarding

---

[21]  Massachusetts law also prescribes overtime pay and
minimum or so called prevailing rates of pay.  See Mass. Gen. L.
ch. 151, § 1A; Mass. Gen. L. ch. 149, § 148.

[22]  Section 27F of chapter 149, which the second amended
complaint references, sets prevailing wage rates for "waste
disposal employees performing under municipal contracts."
Mullally v. Waste Management of Massachusetts, Inc., 895 N.E.2d
1277, 1279 (Mass. 2008).  As to such employees, "An employer may
prorate on an hourly basis qualifying health and welfare benefits
paid on behalf of an employee and deduct that amount from the
prevailing wage rate."  Id. (citing section 27F).

public official or public body.  See Mass. Gen. L. ch. 149, § 27; Teamsters Joint Council No. 10 v. Director of Dept. of Labor and Workforce Development, 849 N.E.2d at 813.

In the course of performing municipal contracts, NWMC submitted weekly payroll certifications and statements of compliance through the mail to various municipalities in Massachusetts, Connecticut and Rhode Island.  (Docket Entry # 23, Ex. 1, ¶¶ 94-100).  The second amended complaint identifies the cities and towns but not the specific contracts or dates and globally represents that the individual RICO defendants and NWMC engaged in thousands of acts of mail fraud.

As previously described, NWMC misclassified plaintiffs as laborers on municipal contracts rather than clam shell or vac haul operators with the corresponding higher wage rates.  NWMC also paid the lower shop rate rather than the higher and correct "on the job" rate.  These and other errors on the part of NWMC led to the certification and compliance forms sent through the mail that contained false information.  Put another way, by sending the certification and compliance forms[23] through the

_____

[23]  The compliance forms included statements that "all mechanics and apprentices, teamsters, chauffeurs, and laborers employed on said project have been paid in accordance with wages determined under the provisions of sections twenty-six and twenty-seven of chapter one hundred and forty nine of the General Laws."  (Docket Entry # 23, Ex. 1, ¶ 97).  Certain certification forms, in turn, falsely represented that "all persons employed on said project have been paid the full weekly wages earned [and]

28

mail, NWMC and the individual defendant made false representations to the municipalities that NWMC was in compliance with wage laws and was paying plaintiffs a prevailing wage. The municipalities thereafter released the funds based on the false representations in the forms and NWMC pocketed the difference between the represented amount and the lower amount it then actually paid plaintiffs.

Addressing the causation argument, defendants maintain that the predicate acts of mail fraud did not cause the injury of the underpayment of plaintiffs' wages. They argue that the certifications constituted "after-the-fact, ministerial, recitations of how Plaintiffs were classified." (Docket Entry # 25).

Even though plaintiffs were not parties to the municipal contracts, the false certifications and compliance forms sent through the mail by NWMC and signed by the individual defendants were not simply ministerial acts or unrelated conduct after NWMC previously decided to incorrectly classify plaintiffs. Rather, the certifications and compliance forms falsely represented that NWMC was paying plaintiffs a particular wage and/or wage rate in accordance with sections 26 and 27 of chapter 149. As a direct result of the false representations, the municipalities released

_____

that no rebates have been or will be made" to NWMC "from the full weekly wages earned by any person." (Docket Entry # 23, Ex. 1, ¶ 96).

29

funds under the contracts (Docket Entry # 23, Ex. 1, ¶ 103) in excess of the amount NWMC actually paid to plaintiffs that was less than the represented rate or amount. The false representations allowed NWMC to continue the scheme of underpaying plaintiffs and avoid detection. The specified racketeering acts therefore have the necessary proximate causation to plaintiffs' injury in the form of lower wages to withstand defendants' futility causation challenge. See System Management, Inc. v. Loiselle, 112 F.Supp.2d 112, 119 (D.Mass. 2000) ("[a]s direct victims, these individual plaintiffs were injured by the alleged overt acts of racketeering even though they were not privy to the underlying contract that governed their wages") (denying summary judgment); see also System Management, Inc. v. Loiselle, 138 F.Supp.2d 78, 93 (D.Mass. 2001) (Loiselle represented "he was fully complying with the wage laws when he sent letters to the [public] College in response to Local 254 complaints" and "Loiselle's mailings were not merely incidental to the fraudulent scheme"), rev'd on other grounds, Systems Management, Inc. v. Loiselle, 303 F.3d 100, 106 & n.7 (1st Cir. 2002) (finding no "pattern" of racketeering activity with underpayments of cleaners in connection with Louselle's contract with public college while noting case would be different if Loiselle planned to engage in same scheme in bidding on other contracts for other jobs).

In addition to causation, defendants maintain that
plaintiffs fail to plead the essential element of intent for the
predicate act of mail fraud.  Mail fraud requires "proof of (1) a
scheme to defraud based on false pretenses; (2) the defendant's
knowing and willing participation in the scheme with the specific
intent to defraud; and (3) the use of interstate mail . . . in
furtherance of the scheme."  Sanchez v. Triple-S Management,
Corp., 492 F.3d 1, 9-10 (1st Cir. 2007).  "[T]he scheme must be
intended to deceive another, by means of false or fraudulent
pretenses, representations, promises, or other deceptive
conduct."  Id.

The facts in the second amended complaint set out a scheme
under which NWMC and the individual defendants submitted
thousands of certifications and compliance forms that contained
false representations to various municipalities about paying
their workers wages in accordance with the prevailing wage laws.
The scope of the false representations, committed thousands of
times in the context of different municipal contracts, supports
the allegation that NWMC and the individual defendants, who
signed the forms, engaged in knowing misrepresentations.  Instead
of using the released funds to pay plaintiffs the represented
amount, NWMC used the funds to pay plaintiffs a lower wage and
then kept the difference.  In other words, NWMC and the
individuals defendants intended the scheme of using the higher

31

paid classifications to deceive the municipalities into releasing funds for such classifications and then paid plaintiffs based on lower hourly rates under lower paid classifications.  See generally Sanchez v. Triple-S Management, Corp., 492 F.3d at 12 ("[T]he scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct").  The second amended complaint therefore adequately pleads the element of intent for the predicate acts of mail fraud.  Finally, notwithstanding defendants' argument to the contrary, the factual allegations demonstrate that the individual defendants shared a common purpose.  See generally U.S. v. Cianci, 378 F.3d 71, 82 (1st Cir. 2004) (discussing requirement that "members share a 'common purpose'"); In re Neurontin Marketing, Sales Practices and Products, 433 F.Supp.2d 172, 179-181 & n.3 (D.Mass. 2006).

Defendants next maintain that the allegations for the section 1962(c) claim do not particularize the time, the individuals' identities, the place and the content of the individual defendants' mail fraud.  It is axiomatic that, "Rule 9(b) applies to RICO claims alleging mail fraud."  Cavallaro v. UMass Memorial Health Care Inc., 2010 WL 3609535, *2 (D.Mass. July 2, 2010).  "[U]nder Rule 9, 'the pleader is required "to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that

fraud."'" Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d
240, 244 (1st Cir. 2006) (quoting North Bridge Associates, Inc.
v. Boldt, 274 F.3d 38, 43 (1st Cir. 2001), which in turn quotes
Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir.
1991)). Consequently, "It is not enough for a plaintiff to
file a RICO claim, chant the statutory mantra, and leave the
identification of predicate acts to the time of trial." Id.
(internal quotations marks and citations omitted).

The second amended complaint identifies the towns but not
the particular contracts or the dates of such contracts.
Likewise, the pleading fails to identify the dates of the
certifications and/or the compliance forms as well as who signed
the documents that contained the false representations. It is
true that plaintiffs' reply brief includes a small number of the
certifications and the compliance forms with Cummings, Sullivan
and/or LaFrancesca's signatures. The attached documents,
however, are only a small sample of the otherwise numerous
certifications and compliance forms submitted to the 95
Massachusetts towns that the second amended complaint references
but does not identify by date. Consequently, the second amended
complaint lacks the requisite details of when the mails were used
to satisfy Rule 9(b). See, e.g., id. at 244 ("while plaintiffs
asserted conclusory in their amended complaint that they were
alleging wire fraud, they did not make the requisite allegations

33

identifying specific interstate phone calls by time, place, and content"). Furthermore, this court is "under no obligation to read the plaintiffs' complaint, which failed to allege with specificity the factual predicates for a RICO violation, as implying that a RICO claim could have been made out with specificity." Id. at 244 n.3.

Given the lack of compliance with Rule 9(b), the issue arises whether to give plaintiffs an opportunity to amend and/or engage in limited discovery to uncover the missing dates. The dates of the municipal contracts and invoices are not necessarily in the exclusive control of defendants. Rather, plaintiffs presumably may obtain them from the towns. Cf. Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d at 244 (permitting "limited discovery in order to give a plaintiff an opportunity to develop the claim and amend the complaint" advisable where facts are in the defendants' exclusive control); see generally New England Data Services, Inc. v. Becher, 829 F.2d 286, 291-292 (1st Cir. 1987). Plaintiffs also fail to argue that they need additional discovery to uncover the information.

That said, "For deficiencies under Rule 9(b), leave to amend is often given, at least for plausible claims." North American Catholic Educational Programming Foundation, Inc. v. Cardinale, 567 F.3d 8, 16 (1st Cir. 2009) (citing New England Data Services, Inc. v. Becher, 829 F.2d at 292). The pleading deficiency

34

appears curable at least with respect to the certifications and compliance forms attached to the reply brief.  The recommended allowance of a dismissal of the section 1962(c) claim will therefore be without prejudice subject to filing a motion for leave to amend.

Defendants address their final argument to the section 1962(a) claim in Count 12 of the second amended complaint. Defendants contend that plaintiffs fail to set out sufficient facts based on an investment use theory against NWMC under section 1962(a).

Section 1962(a) prescribes the receipt and investment of income derived from a pattern of racketeering activity.  The section states:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

In addition to establishing a violation of one of the subsections of section 1962, a RICO plaintiff must show that he "was injured 'in his business or property by reason of' the defendant's violation."  Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp., 57 F.3d 56, 91 (1st Cir. 1995) (quoting 18 U.S.C. § 1964(c)).  In the context of a section

1962(a) RICO violation, RICO plaintiffs must "prove that they were *harmed* by reason of [the defendant's] use or investment of income derived from a pattern of racketeering activity" in an enterprise. Id. (emphasis in original). Plaintiffs must therefore show that it is the harm by the defendant's use or investment of the proceeds of the mail fraud. Thus, "'the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves.'" Id. (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3rd Cir. 1993), in parenthetical). This principle set out by the First Circuit in Compagnie reflects the majority view. See David Smith & Terrance Reed Civil RICO, ¶ 3.07[2][a] n.4 (2010) ("majority of courts hold that a plaintiff claiming under section 1962(a) must plead and prove that his or her injury flowed from the defendant's *use* or *investment* of racketeering income and that it is not sufficient to allege injury flowing from the predicate acts of racketeering") (emphasis in original).

The second amended complaint identifies the racketeering income as the difference between what was owed plaintiffs under one or more municipal contracts and what NWMC actually paid plaintiffs. (Docket Entry # 23, Ex. 1, ¶¶ 104-105). NWMC then reinvested the racketeering income in the NWMC enterprise. (Docket Entry # 23, Ex. 1, ¶ 106). "As a result" of "NWMC's

36

continued and ongoing predicate acts of mail fraud, the
Plaintiffs suffered a direct loss of income."  (Docket Entry #
23, Ex. 1, ¶ 107).  The injury alleged is therefore a result of
the predicate acts.  Except for a bald and unadorned assertion
that plaintiffs "suffered injuries and loss of property" in
paragraph 212 of the second amended complaint, the paragraph does
not identify the injury or the loss of property.  The only
injuries identified in the second amended complaint consist
 of the "loss of income" in the form of unpaid wages, overtime
and benefit contributions.  (Docket Entry # 23, Ex. 1, ¶¶ 107,
152, 158, 163, 168, 174, 179, 184, 190, 195, 208, 212, 213 &
216).

        Accordingly, the second amended complaint does not set out
an investment injury "'distinct from an injury caused by the
predicate acts themselves.'"  Compagnie De Reassurance D'Ile de
France v. New England Reinsurance Corp., 57 F.3d at 91.  The
absence of such an injury is fatal to the section 1962(a) claim.

        In the reply brief, plaintiffs explain that they are
alleging "a single injury stemming from two separate acts akin to
a joint and several liability theory against multiple
tortfeasors."  (Docket Entry # 28, n.3).  The two separate acts
consist of the loss of "wages suffered as a result of the
[i]ndividual" defendants' violations of section 1962(c) and the
loss of wages suffered as a result of NWMC's investment of the

37

proceeds obtained by the individual defendants' predicate acts. (Docket Entry # 28, n.3). Under this scenario the single injury is still the loss of income in the form of wages. The lost wages, however, are not distinct from the injury in the form of the same lost wages caused by the individual defendants' predicate acts.

Plaintiffs also attempt to avoid the investment injury requirement by arguing that NWMC pays Sullivan an annual bonus based on the company's profit which creates an incentive for Sullivan to continue to suppress and underpay plaintiffs' wages. (Docket Entry # 28). Plaintiffs further assert that Sullivan used threats, as described in affidavits attached to the reply brief, to prevent plaintiffs from reporting the underpayments. (Docket Entry # 28). The second amended complaint, however, makes no reference to these foregoing facts. The reply brief therefore states that plaintiffs are incorporating these allegations by reference under Rule 10(c), Fed. R. Civ. P., into the previously filed proposed second amended complaint. (Docket Entry # 28, n.7).

Rule 10(c), Fed. R. Civ. P., provides that, "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." The rule does not state that a statement in a motion or supporting brief may be incorporated by reference into a prior pleading. A motion to

amend the prior pleading under Rule 15, Fed. R. Civ. P., is
required to accomplish such a result.

In addition, the applicable standard of review for futility
is synonymous with the standard of review of a Rule 12(b)(6)
motion to dismiss.  Rule 12(b)(6) review does not allow a non-
movant to make statements in a brief and then incorporate by
reference those statements into the prior complaint under attack.
See Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45,
48 (1st Cir. 2009) (quoting Watterson v. Page, 987 F.2d 1, 3-4
(1st Cir. 1993)); DeLuca v. AccessIT Group, Inc., 695 F.Supp.2d
54, 60 (S.D.N.Y. 2010).  Rule 12(b)(6) review also does not
include affidavits, such as those attached to plaintiffs' reply
brief that describe the threats (Docket Entry # 28, Ex. 4),
absent conversion of the motion into a summary judgment motion.
See Rule 12(d), Fed. R. Civ. P.

The issue thus devolves into whether to allow plaintiffs an
opportunity to file a motion for leave to amend to assert a
section 1962(a) claim against NWMC based on its payment of
bonuses to Sullivan which, in turn, caused Sullivan to threaten
employees with termination or financial consequences if they
reported the underpayment of the wages.  A court may allow a
plaintiff an opportunity to amend a complaint in lieu of a
dismissal under certain circumstances.  See Rodi v. Southern New
England School of Law, 389 F.3d 5, 20 (1st Cir. 2004).

In this case, the pleading deficiency is not a technicality. It is doubtful that including these new allegations would amount to an injury from the investment of the income into the NWMC enterprise that is distinct from the injury of lost wages as a result of the racketeering activity.  See Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004) (permission to amend complaint "often granted not only pretrial but after dismissal for failure to state a claim where court thinks that the case has some promise"); see also Rodi v. Southern New England School of Law, 389 F.3d at 20 (noting that the allegations stated "a colorable claim" as supporting opportunity to amend in lieu of outright dismissal).  Accepting Sullivan's receipt of a bonus and his threats made to employees, all of the funds invested back into the NWMC enterprise are still the savings or profit accomplished by not paying plaintiffs the higher and/or the correct hourly wages and rates that their work entailed.[24]  Under Compagnie, the investment injury must be distinct from the injury caused by the predicate acts.  Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp., 57 F.3d at 91.  Here, the single and

_____

[24]  Indeed, except for the alleged threats, plaintiffs identify Sullivan's acts as the same acts that led to the predicate acts of mail fraud, to wit, "falsifying payroll certifications, falsifying statements of compliance forms, incorrectly classifying the plaintiffs' job classification [and] illegally manipulating the Plaintiffs' hours."  (Docket Entry # 28).

40

only injury remains plaintiffs' loss of income. Although facts preceding the injury that flows from the racketeering activity may differ from facts preceding the injury that flows from the income invested into the NWMC enterprise from the bonus and suppressed wages, the injury is the same, i.e., loss of income in the form of unpaid wages, overtime and benefit contributions. Coupled with plaintiffs' failure to ask for an opportunity to amend and their representation by counsel, see <u>Rodi v. Southern New England School of Law</u>, 389 F.3d at 20 (noting that the plaintiff was pro se and sought leave to amend as supporting opportunity to amend in lieu of outright dismissal), it is not appropriate to afford plaintiffs an opportunity to amend. <u>See Dykes v. Southeastern Penn. Transportation Authority</u>, 68 F.3d 1564, 1572 n.7 (3rd Cir. 1995) (where complaint dismissed for something other than "lack of specificity or some other readily curable defect," the correction of which would not allow complaint to survive a Rule 12(b)(6) motion, dismissal should stand).

CONCLUSION

Accordingly, the motion to amend (Docket Entry # 23) is **DENIED** with prejudice as to adding a section 1962(a) claim against NWMC and **DENIED** without prejudice as to adding a section 1962(c) claim against the individual defendants due to the lack

41

of specificity of the claim.  This court this court **RECOMMENDS**[25]

that the motion to dismiss (Docket Entry # 16) be **DENIED.**


       /s/ Marianne B. Bowler
      **MARIANNE B. BOWLER**
      United States Magistrate Judge

---

[25] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.