UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ROBERT GEORGE, MICHAEL CURVIN, | ) |
| MARK BASSETT, KEVIN COLVIN, | ) |
| KEVIN FREEMAN, JUSTIN KORDAS, | ) |
| CARLOS VILLARREAL, PAUL DOCKETT, | ) |
| JON ELDRIDGE, CHRIS MYERS, | ) |
| ZEF ZEKA, PAUL LeDOUX, ERIC PAIVA, | ) |
| JEFFREY DAVID, and CHRIS MIRISOLA, | ) |
| on behalf of themselves and others | ) |
| similarly situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 10-10289-DJC |
| | ) |
| NATIONAL WATER MAIN CLEANING CO., | ) |
| CARYLON CORP., DENNIS SULLIVAN, | ) |
| ANTONIO LaFRANCESCA, | ) |
| and CARL CUMMINGS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                               September 27, 2012

## I.     Introduction

This is a putative class action in which the named plaintiffs and proposed class representatives (collectively, the "Named Plaintiffs") allege that the defendants National Water Main Cleaning Company ("NWMCC") and Carylon Corporation ("Carylon") (collectively, the "Corporate Defendants") failed to pay legally mandated wages and benefits to their employees working in Massachusetts, Connecticut and Rhode Island.  The Named Plaintiffs further allege that NWMCC employees and defendants Dennis Sullivan, Antonio LaFrancesca and Carl Cummings (collectively, the "RICO Defendants") violated the Racketeering Influenced Corrupt

1

Organizations ("RICO") Act, 18 U.S.C. § 1962(c), by allegedly committing mail fraud by mailing certified payroll statements stating that NWMCC had paid its employees in compliance with applicable wage and benefit laws.

The Named Plaintiffs have now moved for class certification. For the reasons set forth below, their motion is ALLOWED. The Named Plaintiffs have also moved to amend their complaint to add an additional RICO Defendant and that motion is DENIED. All defendants have also moved for judgment on the pleadings only as to the alleged violations of the RICO Act and as to the common law claims. That motion is ALLOWED.

## II.   Factual Background[1]

Defendant NWMCC, a wholly owned subsidiary of defendant Carylon, is in the business of inspecting and cleaning municipal plumbing systems, drains and sewers. Second Amended Complaint ("SAC") D. 38 at ¶¶ 19-20; Ans. D. 43 at ¶¶ 19-20. NWMCC performs work on plumbing systems in Massachusetts, Connecticut, Rhode Island and other states. D.38 at ¶¶ 4-20. The company has a facility in Canton, Massachusetts and is headquartered in Newark, New Jersey. Id. at ¶ 19. From those two locations, NWMCC allegedly sends its workers to various jobs around the northeastern United States. D. 50 at 2 n.1.

The Named Plaintiffs are current and former employees of NWMCC and Carylon who work out of NWMCC's Canton office. D. 38 at ¶¶ 4-18. The Named Plaintiffs performed work inspecting and cleaning sewers and drains using a variety of methods and tools. Id. at ¶ 1, 4-18. For example, one of the tasks performed by "approximately 20%" of NWMCC's workforce, D. 60 at 8, and by many of the Named Plaintiffs, D. 38 ¶¶ 4-18, is "catch basin cleaning," D. 38 at ¶¶ 70-74, which involves cleaning and removing debris from the entry point of sewer systems.

---

[1] Except where otherwise noted, this statement of facts is drawn from the Named Plaintiffs' Second Amended Complaint, D.38.

A worker can use a variety of tools, including a "clam shell truck" and a "jet-vac truck" to clean a catch basin.   D. 60 at 6 n.7.   Other tasks performed by employees include "manhole rehabilitation and sewer line inspection and cleaning."  D. 60 at 8.

The Named Plaintiffs generally were paid based on their working time as recorded on "time cards," which are described in more detail below.  D.53 at 2-5.  On these time cards, employees recorded information such as the number of hours of "job time" and "shop time" as well as the type of job, the type of equipment used, and other information as described below.  D. 53 Ex. L (sample time cards).  NWMCC paid its employees a fixed amount for job time and a lesser amount for shop time, and paid employees at the shop time rate when they were working but not "on the job" (as characterized by Corporate Defendants).  D. 38 ¶¶ 61-62, 67; D. 43 ¶¶ 61-61, 67.

NWMCC workers worked on municipal contracts that were subject to state prevailing wage laws.  D. 38 ¶ 40; D. 43 ¶ 40.  Prevailing wage statutes require employers to pay their employees working under qualified contracts a specified hourly rate.  D. 38 at ¶¶ 40-44.  The "prevailing wage" rate is set by a government agency and is based upon the prevailing wages for particular types of jobs in the relevant community.  Id.[2]

The Named Plaintiffs make a number of factual allegations about the way in which they worked and were paid, and which they claim, as described below, support their claims that the Defendants violated state wage laws.  As examples, the plaintiffs allege that the Corporate Defendants classified "all workers who work on municipal contracts as 'laborers' regardless of

---

[2] For example, attached to the pleadings is a document entitled "Massachusetts Executive Office of Labor and Workforce Development Division of Occupational Safety Prevailing Wage Rates."  D. 60 Ex. G.  At the top of the document are entries for awarding authority, contract number, city, description of work, and job location.  Id.  Below this information is a table organized as a series of job classifications, wages, and effective dates.  Id.  The document describes the work of "Catch Basin Cleaning" and contains the wage table with twenty-nine job categories, including "(2 Axle) Driver – Equipment," "Clam Shells / Slurry Buckets / Heading Machines," and "Laborer."  Id.

their job duties." D. 38 ¶ 59. The Named Plaintiffs allege that the prevailing wage for many prevailing wage job classifications, including "laborer" "in most if not all cases" is higher than the "job time" and "shop time" rates paid by the Corporate Defendants. D. 38 ¶¶ 64-65. The Named Plaintiffs assert that the Corporate Defendants paid the "shop time" rate rather than the higher prevailing wage whenever a piece of equipment broke down, D. 38 ¶ 69 and whenever workers moved equipment from the NWMCC facility to the job site. D. 38 ¶¶ 86-89. The Named Plaintiffs allege that the Corporate Defendants did not pay overtime wages based on a "blended formula." D. 38 ¶¶ 75-85. The Named Plaintiffs state that Corporate Defendants deducted payments made to employee pension plans and supplementary unemployment benefit plans from wages. D. 38 ¶ 91. As to catch basin work, the Named Plaintiffs allege that the Corporate Defendants deducted wages paid when catch basin cleaning "quotas" were not met, D. 38 ¶¶ 72-73, or whenever a catch basin had to be re-cleaned. D. 38 ¶ 74. It appears there is no dispute that NWMCC management would "adjust the time" reported on time cards downwards when management had concerns about employee productivity. D. 53 at 4; D. 53 Ex. A ¶¶ 12-13.

The Named Plaintiffs allege that the Corporate Defendants through these actions, and others as alleged in the SAC, violated state prevailing wage, overtime, and payment frequency laws. D. 38 ¶¶ 75-93. The Named Plaintiffs further allege that the RICO Defendants every week mailed weekly certifications to municipalities stating that employees of the Corporate Defendants had been paid in accordance with wage laws. D. 38 ¶ 129.

## III.    Procedural Background and Causes of Action

The Named Plaintiffs filed this putative class action in the Norfolk Superior Court on December 7, 2009, against only the Corporate Defendants. D. 1 ex. A. Their original complaint alleged violations of federal and Massachusetts wage statutes and sought an accounting for all

monies owed to the putative class of "individuals [who] have worked for [NWMCC] in Massachusetts." D. 1 ex. A at ¶ 44. The Defendants removed this case to this Court on February 19, 2010. D. 1. On March 9, 2010, the Named Plaintiffs filed their first amended complaint, in which they dropped all counts alleging violations of federal law and added two Massachusetts common law claims for breach of contract (against defendant NWMCC only) and unjust enrichment (against both Corporate Defendants). D. 6 at ¶¶ 89-100. On May 12, 2010, Plaintiffs sought to amend their complaint to add RICO claims against the RICO defendants, which a magistrate judge denied with prejudice in part, but without prejudice as to claims arising from 18 U.S.C. § 1962(c) should the plaintiffs add allegations to meet the pleading requirements of Fed. R. Civ. P. 9(b). D. 32. On June 3, 2011, the Named Plaintiffs filed a motion to file the SAC in which they added a count alleging that the RICO Defendants, NWMCC employees Dennis Sullivan, Antonio LaFrancesca, and Carl Cummings, had violated the RICO Act, 18 U.S.C. § 1962(c), for their alleged commission of "thousands" of acts of mail fraud in violation of 18 U.S.C. § 1341 as part of an "intentional . . . pattern of racketeering activity." D. 38 at ¶¶ 237-238.[3] The SAC also added thirteen additional named plaintiffs, added counts alleging violations of Rhode Island and Connecticut state wage statutes, D. 38 at ¶¶ 192-223, and expanded the scope of the putative class by proposing three subclasses consisting of NWMCC workers who were subject to Massachusetts, Rhode Island and Connecticut wage laws, respectively. Id. at ¶¶

---

[3] 18 U.S.C. § 1962(c) declares it to be "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). 18 U.S.C. § 1964(c) provides a civil cause of action for such conduct, allowing "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court and [if successful] shall recover threefold the damages he sustains and the cost of the suit." 18 U.S.C. § 1964(c). 18 U.S.C. § 1961 defines "racketeering activity" to include "any act which is indictable under . . . [18 U.S.C.] 1341 (relating to mail fraud) . . . ." 18 U.S.C. § 1961.

136-174.  The Defendants did not oppose this motion and the Court allowed the motion, D. 33, 3/25/11 docket entry, and the SAC remains the operative complaint.

The operative claims against the Corporate Defendants are that they violated state prevailing wage statutes (Mass. Gen. L. c. 149, §§ 26-27, Conn. Gen. Stat. § 31-53 and R.I. Gen. L. § 37-13-7), state overtime statutes (Mass. Gen. L. c. 151, § 1A, Conn. Gen. Stat. § 31-76c and R.I. Gen. L. § 37-13-10) and state statutes dictating payment frequency (Mass. Gen. L. c. 149, § 148, Conn. Gen. Stat. § 31-71b and R.I. Gen. L. § 37-13-3).  Id. at ¶¶ 175-223.  The Named Plaintiffs also assert a breach of contract claim against NWMCC as an alleged third party beneficiary to contracts that NWMCC made with "various state and municipal entities, which were covered by the provisions of [these states'] prevailing wage and overtime laws." Id. at ¶ 225.  The Named Plaintiffs also assert an unjust enrichment claim against both Corporate Defendants.  Id. at ¶¶ 231-235.  The Named Plaintiffs seek an accounting to determine any compensation due to members of the putative class.  Id. at ¶¶ 240-244.  The operative claim against the RICO Defendants are that these named individuals violated 18 U.S.C. § 1962(c) through the predicate racketeering activity of violating 18 U.S.C. § 1341.

The Named Plaintiffs have now moved for class certification, D. 49, and there have been multiple rounds of briefing on this motion.[4]  D. 50, 53, 60, 63, 93, 94.  The Named Plaintiffs also have moved to amend their complaint to add an additional RICO Defendant.  D. 86.  Finally, the defendants have also moved for judgment on the pleadings as to the alleged RICO violations and as to the common law claims against them.

---

[4] The defendants changed counsel after filing their sur-reply.  The Court allowed new counsel to file additional briefing to address the Supreme Court's decision in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2561 (2011).

IV.     **Discussion**

A.      **The Named Plaintiffs' Motion for Class Certification**

1.      *Burden of Proof*

The Named Plaintiffs move for class certification pursuant to Fed. R. Civ. P. 23(b)(3). D. 49. A class action may be certified under this rule only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 18-19 (1st Cir. 2008) [hereinafter Motor Vehicles]. In addition to these factors— numerosity, commonality, typicality and adequacy of representation—since the Named Plaintiffs have moved to certified the class under Fed. R. Civ. P. 23(b)(3), this Court must also determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); Motor Vehicles, 522 F.3d at 19. The plaintiffs have the burden of showing that all the prerequisites for a class action have been met. Makuc v. American Honda Motor Co., Inc., 835 F.2d 389, 394 (1st Cir. 1987). The Court "must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class" and thus must independently decide whether all of these factors have been met. Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 38 (1st Cir. 2003) (citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)).

The Court shall address each of Fed. R. Civ. P. 23(a) and 23(b)(3) factors in turn, although the defendants' primary objection to class certification is that "individualized inquiries

overwhelmingly predominate over any common questions of fact or law."  Opp. to Cl. Cert., D.
53 at 1.

2.    *Addressing the Fed. R. Civ. P. 23(a) Factors*

a)    The Named Plaintiffs Have Established Numerosity

To bring a class action "the class [must be] so numerous that joinder of all members is
impracticable."  Fed. R. Civ. P. 23(a) (1).  "'Impracticability' does not mean 'impossibility,' but
only the difficulty or inconvenience of joining all members of the class."  Adver. Special. Nat.
Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956).  The finding of impracticability is a matter of
discretion for the Court.  Id.  The absolute number of class members is not the sole determining
factor, and "[t]here is no threshold number of class members that automatically satisfies this
requirement."  Shanley v. Cadle, 277 F.R.D. 63, 68 (D. Mass. 2011), citing Gen. Tel. Co. of the
Nw. v. EEOC, 446 U.S. 318, 329 (1980).  That said, courts have generally found that a class size
of forty or more individuals will satisfy the numerosity requirement.  In re Relafen Antitrust
Litigation, 218 F.R.D. 337, 342 (D. Mass. 2003), and case cited.

The Defendants do not dispute numerosity.  D. 43 at 37-39; D. 93 at 5.  Upon
independent review, the Court finds that this requirement is met.  Here, the Named Plaintiffs
alleged in their amended complaint that, "on information and belief, 70 plus individuals" are
members of the proposed class including employees working in Massachusetts, Connecticut, and
Rhode Island.  D. 38 at ¶¶ 141, 154, 167.  In the memorandum supporting their motion for class
certification, the Named Plaintiffs allege that "[t]here are at least 50-100 workers who performed
work on Defendants' prevailing wage contracts."  D. 50 at 6.  Based on the plaintiffs'
allegations, the Court finds that the proposed class is sufficiently numerous as to make joinder of
all members impracticable.

b)      The Named Plaintiffs Have Established Commonality

To proceed as a class action, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has noted that this "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common "questions."' . . . What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) [hereinafter Dukes] (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009)). The Named "Plaintiffs' claims must depend upon a common contention [that] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 2551.

The defendants argue that the Named "Plaintiffs' attempt to [demonstrate commonality] rests entirely on their assertion that all [NWMCC] employees . . . were paid at a uniform 'job' rate." D. 53 at 17. The defendants further contend that commonality is absent because:

> Plaintiff's claims depend on a myriad of variables – including the type of work performed, the type of contract under which it was performed, the state and municipality where it occurred, and the amount of time actually spent engaged in prevailing wage work – that vary from worker to worker and from day to day. . . . Variation with respect to key facts necessary for Plaintiffs to establish both liability and damages with respect to each of their theories of liability . . . preclude class treatment."

D. 93 at 2, 6. For these reasons, the defendants argue, the Named "Plaintiffs cannot identify a single question that would resolve an issue central to the claims of all the putative class members in a single stroke," id. at 6, and thus, that plaintiffs' commonality claim must fail.

The Court disagrees. First, the defendants seize on the "one stroke" language quoted above from Dukes, 131 S. Ct. at 2551, and read that language in isolation from the rest of that

opinion to contend that the standard for commonality is much more stringent than what the Named Plaintiffs have shown.  D. 93 at 6.  The defendants highlight the language in <u>Dukes</u> that commonality cannot be met where there is no "common contention [that] is central to the validity <u>of each one of the claims</u> . . . ."  <u>Id.</u> (quoting <u>Dukes</u>, 131 S. Ct. at 2551) (emphasis as provided by defendants).

There are two ways to read this isolated language.  The first, which defendants wisely do not pursue, is that all of the claims raised by the Named Plaintiffs must be common to all members of the putative class.  <u>Dukes</u> makes clear that this reading is not correct; Rule 23(a)(2) does not require that <u>all</u> questions of law or fact raised in the litigation be common, and in fact, "for purposes of Rule 23(a)(2) [e]ven a single [common] question will do."  <u>Dukes</u>, 131 S. Ct. at 2556.  Nor must there be common questions of both law and fact.  "It is well settled that the requirement of 'common questions of law or fact' in Rule 23(a) is disjunctive."  1 Newberg on Class Actions § 3:21 (5th ed. 2012), and cases cited.

The second interpretation of this isolated language, and the argument advocated by defendants, is that all of the class members must rest on a common contention.  The defendants argue that because the putative class members "did not work under the same contract or set of contracts, and therefore were subject to different pay rates," D. 93 at 7, that there is no common contention across class members.  "Even if the contract rates for Defendants' contracts were established, liability – whether the employee was actually underpaid – is only established if the contractual rate is higher than the rate paid to the employee."  <u>Id.</u> at 8.

This argument confuses the scope of the relevant question required to establish commonality, as is clear from the <u>Dukes</u> opinion itself.  In <u>Dukes</u>, the defendant company had a uniform policy forbidding gender discrimination but left promotion decisions up to individual

managers.  131 S. Ct. at 2253-54.  A putative class of one and a half million plaintiffs alleged a pattern or practice of gender discrimination in promotion decisions and sought backpay and injunctive relief.  Id. at 2547.  The district court certified the class, and the Ninth Circuit affirmed, allowing both liability and damages to be determined as to a "sample set of the class members."  Id. at 2561.  The Supreme Court reversed, vacating the class certification.  Id.

But in doing so, the Supreme Court provided an example of an acceptable common question: "[The plaintiffs'] claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor."  Id. at 2551.  What was not acceptable in Dukes was the district court's extrapolation of a common contention that was so over-inclusive as to sweep in putative class members whose managers were never asserted to have had exactly the same discriminatory bias as other managers in the case.  Id. at 2555 (observing that "[i]n a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction.")  Dukes makes clear that claims of harm arising from a truly common source, such as illegal bias arising from a particular supervisor, can provide the common contention required for a class action.  Even where that common contention is shown – that is, even in cases where the Named Plaintiffs allege exactly what the Supreme Court gave as its exemplar for a common question – individual questions will of course remain as to how to remedy the harm to a particular employee (e.g., how much backpay should an individual employee receive?).  But those inquiries go not to commonality (since clearly, these are not common questions of fact) but to predominance, which the Court addresses below.

Here, drawing upon just one of the plaintiffs' allegations, the assertion of illegal prevailing wages due to a single wage policy is an analogue to the Supreme Court's sample

"assertion of discriminatory bias on the part of the same supervisor." Id. at 2551. In both examples, all of the putative class members allege to "have suffered the same injury," id. (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982)), from the same source. In both examples, the damages that should flow to the class members if the injury is proven is a separate question. In both cases, the plaintiffs can establish commonality. Unlike the doomed class in Dukes, the Named Plaintiffs have "identified a common mode of [paying workers] that pervades the entire company." Id. at 2555.

By reading the Named Plaintiff's SAC and the defendants' answer, one can find numerous common questions of law and fact in dispute whose "common answers [are] apt to drive the resolution of the litigation." Id. at 2551. For example, the Named Plaintiffs allege that:

> Even though NWMC and Carylon appear to have classified their workers as "laborers" pursuant to all municipal contracts, and assuming for the sake of argument that this was the correct classification, in practice their workers never actually received the rate applicable to "laborers" pursuant to any of NWMC's municipal contracts . . .

D. 38 at ¶ 63. The defendants deny these allegations. D. 43 at ¶ 68. This disagreement gives rise to several common questions of law and fact applicable to the entire putative class whose resolution is central to determination of the lawsuit (e.g., Did the Corporate Defendants pay "laborers" the statutory prevailing wage rate for "laborers" (a question of fact)? Were the Corporate Defendants required to pay "laborers" the statutory prevailing wage rate for "laborers" (a question of law)?) While "[e]ven a single [common] question will do," Dukes, 131 S. Ct. at 2556, there appear to be several that spring directly from the commonly alleged behavior found in the SAC, all deriving from the same alleged injury and allegedly applicable to all workers.[5]

---

[5] In their motion for class certification, the Named Plaintiffs asserted eleven "Common Questions of Fact and/or Law." D. 50 at 8. Having identified Dukes-compliant common questions from the SAC itself, D. 38, the Court does not evaluate the commonality of all of these questions as presented, except to note that a number of them overlap and are in line with the common questions that the Court has discussed above.

<u>See, e.g.</u>, D. 38 at ¶ 81 ("[NWMCC] does not compute overtime pay using the . . . formula required by law); <u>id.</u> at ¶ 88-89 ("[NWMCC] does not compensate its workers for . . . travel time); <u>id.</u> at ¶ 92 ("[NWMCC] unlawfully deducts . . . contributions it makes to its employees' pension plans . . .).  Accordingly, the Court finds that the Named Plaintiffs have met their burden to establish commonality.

c)      <u>The Named Plaintiffs Have Established Typicality</u>

A class action requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  <u>Dukes</u>, 131 S. Ct. at 2551 n.5 (quoting <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 157-158, n.13 (1982)).  Commonality looks at the relationship among the class members generally, while typicality focuses on the relationship between the proposed class representative and the rest of the class.  <u>See generally</u> 1 William B. Rubenstein, <u>Newberg on Class Actions</u> § 3:26 (5th ed. 2012).

"The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class."  <u>Barry v. Moran</u>, No. 05-10528-RCL, 2008 WL 7526753 at *11 (D. Mass. Apr. 7, 2008) (quoting <u>McLaughlin v. Liberty Mut. Ins. Co.</u>, 224 F.R.D. 304, 310 (D. Mass. 2004)).  In evaluating typicality, the Court seeks to ensure that the "named plaintiff[s], in presenting [their] case, will necessarily present the claims of the absent plaintiffs."  <u>Randle v.</u>

13

Spectran, 129 F.R.D. 386, 391 (1988) (quoting Priest v. Zayre Corp., 118 F.R.D. 552, 555 (D.

Mass. 1985)).   Here, the Court finds that the Named Plaintiffs' claims and defenses are so

interrelated with the class's claims and defenses that the interests of the class members will be

protected.

The defendants argue that "[t]ypicality may be defeated . . . if factual differences

predominate to the extent where the court must make highly fact-specific or individualized

determinations in order to establish a defendant's liability to each class member." D. 53 at 17-18

(quoting Barry, 2008 WL 7526753, at *11).   But to the extent that this argument blends

typicality with predominance, see Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 n.18

(1997) (noting similarity between these two factors), the Court, for the reasons discussed below,

rules that common questions will predominate over any individualized inquiries.   To the extent

that this argument goes beyond predominance, the Court holds below that any atypical claims

and defenses can be considered as necessary through individualized inquiries.   See Ramos v.

SimplexGrinnell LP, 796 F. Supp. 2d 346, 357 (E.D.N.Y. 2011) (noting that "[a]lthough named

plaintiffs and putative class members may differ with respect to job classification, office

location, and the amount of testing and inspection work each performed, these differences do not

destroy typicality. . . . These differences—job classification and locality—are not sufficiently

significant to plaintiffs' claims to undermine typicality, particularly because plaintiffs challenge

payroll practices defendant employed throughout the state").   The Court finds here that the

Named Plaintiffs' claims and defenses are typical of the claims of the entire class.

> d)      The Named Plaintiffs Have Established Adequacy of
>         Representation

The Court must evaluate whether "the representative parties will fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); see Andrews v. Bechtel Power Co.,

780 F.2d 124, 130 (1st Cir. 1985).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  Amchem, 521 U.S. at 625-626 (quotation omitted).  The Named Plaintiffs are part of the putative class and allege the same injury as the class members.  D. 50 at 13.  They also assert that they do not have interests that are antagonistic to the putative class, and for all but the alleged overtime claims, the Court does not have a reason to conclude otherwise, or to conclude that conflict exists within the class.  Id.

In their last round of briefing, the Defendants attack the Named Plaintiffs' adequacy of representation as to the Named Plaintiffs' alleged overtime claims, stating that:

> a number of the Plaintiffs testified [in depositions] that they were sometimes paid overtime at a rate of one and one-half times their "job rate," resulting in a higher rate of overtime pay than they would have received if a "blended rate" had been used.  See, e.g., [D. 93 ex. P, Dep. of Eldridge, pp.] 105:3-106:22 (testifying to consistently receiving overtime pay at higher "job rate" and confirming inaccuracy of allegation in complaint concerning receipt of overtime pay at lower "shop rate").  In other words, some plaintiffs may actually have <u>benefitted</u> from the alleged overtime practice challenged in the Complaint."

D. 93 at 11 (emphasis in original).  The key point from the defendants' claim here is that "some" plaintiffs benefitted, while (implicit in the defendants' argument) others suffered.  If this were true, it could be problematic, since it could create an internal conflict within the class.  See Valley Drug Co. v. Geneva Pharmaceuticals, 350 F.3d 1181, 1191 (11th Cir. 2003) (holding that class certification was improper where some class members may have benefited financially from alleged illegal conduct at issue).  The Court concludes that this record, a single deposition excerpt, does not rise to the level of a sufficient showing of conflict to defeat the adequacy of the Named Plaintiffs as class representatives.  The defendants' argument rests on the premise that the Corporate Defendants' formula sometimes, but not all times, resulted in "a higher rate of

overtime pay than they would have received if a 'blended rate' had been used." D. 93 at 11.

That argument makes assumptions about the merits that are not now before the Court. Eisen,

417 U.S. at 177-178 (quoting Miller v. Mackey Int'l, 452 F.2d 424 (5th Cir. 1971). Furthermore,

equally plausible from the cited deposition transcript is that the Named Plaintiffs' assertions as to

defendants' overtime practices are incorrect, such that the Named Plaintiffs are still

representative parties.

On the record now before the Court, the Court is satisfied that the Named Plaintiffs stake

in the outcome is such that they "will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a) (4).   However, as this issue is developed as the litigation progresses, an

appropriate course of action may be the use of subclasses or partial decertification as to the

overtime claims to address any internal conflict within the class. Fed. R. Civ. P. 23(c)(1)(C).

The Court must also evaluate the adequacy of the attorneys seeking appointment as class

counsel.[6]   The Court considers whether "counsel chosen by the representative party is qualified,

experienced and able to vigorously conduct the proposed litigation," Andrews, 780 F.2d at 130,

---

[6] While the Court's evaluation of counsel traditionally was performed under Fed. R. Civ. P. 23(a)(4), see, e.g., Andrews v. Bechtel Power Co., 780 F.2d 124, 130 (1st Cir. 1985), commentators have suggested that, after the 2003  insertion of Fed. R. Civ. P. 23(g), courts should "locate their entire discussion of class counsel within the 23(g) analysis and restrict their analysis under Rule 23(a)(4) to the topic of adequacy of the proposed class representative."  1 William B. Rubenstein, Newberg on Class Actions §§ 3:54-3:55, 3:80-3:81 (5th ed. 2012) (suggesting that "[c]ourts have been slow in shifting the analysis of counsel's adequacy from Rule 23(a)(4) to Rule 23(g)"), and cases cited.  This is also reflected in the Rule Committee's 2003 advisory notes, which state that "Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while [23(g)] will guide the court in assessing proposed class counsel as part of the certification decision."  Fed. R. Civ. P. 23(g) advisory committee's notes.

The First Circuit has not addressed the interaction, if any, between Fed. R. Civ. P. 23(g) and Fed. R. Civ. P. 23(a)(4) and courts within this Circuit have taken different approaches.  Compare, e.g., Barrett v. H&R Block, Inc., No. 08-10157-RWZ, 2011 WL 1100105 at *8 (D. Mass. March 21, 2011) (certifying class without analyzing adequacy of counsel, but inviting "any counsel who wishes to serve as class counsel" to apply per 23(g)) with Bertella v. JetDirect Aviation, Inc., No. 09-10527-RGS, 2010 WL 4103664 at *3-4 (D. Mass. Oct. 19, 2010) (acknowledging traditional approach but then considering issues of counsel solely under 23(g)) and In re Organogenesis Securities Litigation, 241 F.R.D. 397, 409-410 (D. Mass. 2007) (importing 23(g) factors into analysis of 23(a)(4)).  For the sake of completion and since the Named Plaintiffs have addressed the adequacy of proposed class counsel in their papers, D. 50, the Court addresses the issue of class counsel here.

and whether counsel has met the requirements of Fed. R. Civ. P. 23(g).  Here, the Named

Plaintiffs assert that their chosen counsel is "experienced in prevailing wage class action

litigation," and that they have "litigated several significant wage and hour class action matters in

. . . federal court."  Named Plaintiffs' counsel appears to have done adequate work in

"identifying or investigating potential claims in the action" since the filing of this lawsuit, as

demonstrated in part by refinements to their claims over the course of this litigation.  Fed. R.

Civ. P. 23(g)(1)(A)(i).  Based on statements made in counsel's affidavit, D. 50 Ex. E, Named

Plaintiffs' counsel have adequate "experience in handling class actions," "knowledge of the

applicable law," and adequate "resources that counsel will commit to representing to class."

Fed. R. Civ. P. 23(g)(1)(A)(ii-iv).  Based upon this record, the Court is satisfied as to counsel's

ability to represent fairly and adequately the interests of the class.

3.    *Addressing Fed. R. Civ. P. 23(b)(3) Factors*

a)    <u>The Named Plaintiffs Have Established Predominance</u>

To bring a class action under Fed. R. Civ. P. 23(b)(3), the Court must find that "questions

of law or fact common to class members predominate over any questions affecting only

individual members."  The rule further directs the Court to consider the putative "class members'

interests in individually controlling" the litigation, the "desirability or undesirability of

concentrating the litigation" in this forum; and the "likely difficulties in managing a class

action."[7]  Fed. R. Civ. P. 23(b)(3).  Part of the rationale for requiring predominance (and

superiority, as discussed below) to bring a class action is to ensure that the action "will achieve

economies of time, effort, and expense, and promote . . . uniformity of decision as to persons

---

[7] The Federal Rules also direct the Court to consider "the extent and nature of any litigation concerning the controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  The Court is aware of no such pending litigation in this case.  These four factors also factor into the court's consideration of superiority.

similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 624 (quoting Fed. R. Civ. P. 23 advisory committee's notes).

The predominance inquiry is "demanding" because the Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Motor Vehicles, 522 F.3d at 6 (quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000)). The Court does not make this forecast based on the merits of the arguments, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-178 (1974) (rejecting such a "preliminary inquiry"), but instead considers the relative importance and prevalence of the different issues within the lawsuit.

Here, the defendants assert that "individualized inquiries overwhelmingly predominate over any common questions of fact or law." Opp. to Cl. Cert., D. 53 at 1. The defendants assert that resolution of Named Plaintiffs' allegations can only be resolved by having the Court embark on a "painstakingly detailed, week-by-week and employee-by-employee examination of time cards and tasks performed" to determine if the Corporate Defendants violated prevailing wage laws. Id. at 9. The defendants further assert that the employee records, particularly the time cards, have characteristics that require individual attention and mandate denial of the class certification. An excerpt of the defendants' description of the time cards is as follows:

> "To keep track of their hours for payroll purposes, [NWMCC] required [employees] to complete time cards, which they did generally, by hand, on a daily basis. [Employees] indicated a start and stop time. [Employees] also divided their time between job hours, shop hours and (on occasion) travel time . . . . [Employees] also provided specific details about the work they performed on the day in question, such as the type of equipment they used, the number of catch basins cleaned, the number of trips taken to the dump to discharge the material they had cleaned, and the total number of files driven during the day. . . . [Employees] reported different numbers of miles driven each day, and often reported different numbers of trips to the dumps."

Opp. to Cl. Cert., D. 53 at 2-5.  The defendants assert that the time cards, in addition to being variable as employees did different tasks on different days, also have insufficient information to resolve the Named Plaintiffs' claims so that individualized inquiries are both necessary and would dominate the litigation.  For example, one of the alleged claims is that Corporate Defendants did not pay the required prevailing wage when an employee performed a wage-regulated task.  The defendants contend that some of the time cards do not specify how long each employee spent on individual tasks performed in their work day.  An employee working as "catch basin cleaner" might record eight hours of "job time" without breaking out working time further, except to provide a count of number of "catch basins" cleaned, number of miles driven, and number of times the contents of the catch basins were taken to the dump.  Id. at Tab L.  The defendants present excerpts of some of the Named Plaintiffs' deposition testimony to the effect that the time spent in these individual activities – which defendants argue determines which work was compensable at "prevailing wage" rates – varied day-to-day and job-to-job.  Id. at 4-5.

As a separate issue, the defendants suggest that the time cards may not be reliable, noting that "several of the Plaintiffs have testified that they would take breaks during the day . . . and would round up their hours from time to time, therefore taking credit – and payment – for hours they did not actually work."  Id. at 5.  The defendants have presented an excerpt of deposition testimony from one Named Plaintiff who admitted that, on one date in the course of his employment, he left a job site early and did not adjust his time card to reflect his departure.  Id. at 5-6 (citing Dep. of Kordas, id. at Tab H, pp. 95-96).  The defendants have also proffered an excerpt of deposition testimony from a NWMCC employee who testified that the two original Named Plaintiffs in this case "grossly overstated their hours and included hours spent in [donut]

shops as hours worked on [their] work order cards."  Id. at 6 (citing Dep. of Ambrose, id. at Tab

M, pp. 108-110).

In sum, the defendants argue that class certification is improper because to calculate any

damages owed to a putative class member, one must confront, as a predominating issue, the

variability, specificity and accuracy of the time cards.  The defendants argue that in this case "the

liability inquiry and the damages inquiry are identical."  Id. at 10.  The Court does not agree with

Defendants' arguments for three reasons.

First, the question of whether the Corporate Defendants committed illegal acts, and the

question of how much money is owed to an individual employee as a result of any illegal acts,

are not identical.  Here, the initial determination of liability will not depend on what an employee

wrote on his time card.  The plaintiffs accuse the Corporate Defendants of maintaining allegedly

illegal wage policies that affect all members of the putative subclasses, such as:  (1) classifying

"all workers who work on municipal contracts as 'laborers' regardless of their job duties," D. 38

¶ 59; (2) paying a lower "shop rate" rather than the higher prevailing wage when a piece of

equipment breaks down, D. 38 ¶ 69; (3) enforcing a "policy of requiring its employees that

perform catch basin cleaning work to clean a minimum of twenty catch basins per day [and]

deduct[ing] wages" when this quota is not met, D. 38 ¶¶ 72-73; (4) "deducting wages . . . for any

catch basin that is" rejected by a municipality and must be re-cleaned, D. 38 ¶ 74; (5) using a

fixed overtime wage rather than a "blended formula" to calculate overtime when an employee

works more than 40 hours per week, D. 38 ¶¶ 75-85; (6) paying for travel time when an

employee moves equipment from NWMCC's Canton facility to a job site at a rate other than the

prevailing wage rate, D. 38 ¶¶ 86-89; and deducting payments made to employee pension plans

and supplementary unemployment benefit plans from wages.  D. 38 ¶ 91.  Whether these and

other alleged wage practices were illegal, and whether the Corporate Defendants actually engaged in this behavior toward the putative class, are the predominant common questions of law and fact that must be decided in this case. These questions are amenable to class-wide resolution and generally will turn on defendants' common policies and not on questions of law or fact relevant to particular individuals. To the extent that there are any individualized inquiries necessary, common questions are still predominant.

As to damages, the individualized inquiry necessary will, like many class actions, be compatible with a class action. "The individuation of damages . . . is rarely determinative under Rule 23(b)(3). Where . . . common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Smilow, 323 F.3d at 40, and cases cited. As to the natural variability of the employee time cards, there unquestionably will be differences as to what activities each employee performed, and therefore what prevailing wage (if any) should apply. But again, "these differences do not predominate over the main issue: whether defendant systematically failed to pay its employees the prevailing wages due them." Ramos, 796 F. Supp. 2d at 359. "[N]umerous courts have found that wage claims are especially suited to class litigation— perhaps 'the most perfect questions for class treatment'—despite differences in hours worked, wages paid, and wages due." Id. (quoting Iglesias–Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007)) (collecting prevailing wage class action cases where predominance was found despite individual issues).[8] In other words, common questions of fact and law will

---

[8] The defendants argue that Ramos, 796 F. Supp. 2d at 353-357, is distinguishable because "[i]n contrast to Ramos, the number of calculable hours in this case (that is, the time that [putative class members] were working on a public works project) is the single most important issue to resolve in determining whether liability even exists." D. 53 at 16-17. The Court disagrees, and notes that, like Ramos, id., many predominant common questions, such as whether prevailing wages were paid to "laborers," does not depend at all on the number of hours spent working on public works projects. To the extent that defendants' arguments assume that they satisfied any prevailing wage

predominate over any individualized inquiry on damages required by the inevitable variability of employee records.

As to the alleged lack of specificity of the time cards, the defendants' arguments opposing class certification erroneously rely on the defendants' own view of the merits as to what work was compensable at "prevailing wage" rates.  In other words, the defendants assume that the Court has already made this determination in their favor, where in fact, it is clearly a live issue as to what time must be paid at "prevailing wage" rates.  Such reliance is misplaced.  Nor is it appropriate to reach the merits of these issues when deciding this pending motion for class certification.  Eisen, 417 U.S. at 177-178.  Again, the Court concludes that common questions of fact and law will predominate over any individualized inquiry on damages required by the specificity of employee time cards.

Second, the defendants' argument that some of NWMCC's employees misrepresented working time on their time cards is a separate issue from whether the Corporate Defendants violated state law with their wage payment practices.  These two types of purported wrongs do not cancel each other out and do not affect each side's liability to the other as to those separate issues.  Stated differently, it is not a defense to liability for a statutory violation of state wage laws to allege that some portion of the plaintiffs committed an unrelated second wrong.

Third, to the extent that there are relevant individual issues, the Corporate Defendants will be entitled, as due process requires, later in these proceedings to show that they were in fact not liable to a particular plaintiff under the wage laws.  "[T]he burden of proof will shift to the company, but [they] will have the right to raise any individual affirmative defenses it may have" and to demonstrate, if necessary through further individualized proceedings, why an employee

---

obligations by other means, D. 53 at 16-17, such arguments go to the merits of the case to be resolved later in this litigation.  Eisen, 417 U.S. at 177-178.

was lawfully paid less than what he claimed to be owed.  <u>Dukes</u>, 131 S. Ct. at 2561.  For example, here the defendants state that "where an employee reported a certain number of hours as 'job' hours but the employee's productivity did not match up with the hours reported, [NWMCC] would adjust the time in an effort to preclude the employee from artificially over-inflating the 'job' time to be paid."  D. 53 at ¶ 4.  That action, if lawful, could be raised by the Corporate Defendants to explain why the employee was not paid what might otherwise seem to be have been required by law.  These individual proceedings, if later determined to be required, do not thwart class certification.  <u>See, e.g.</u>, <u>id.</u> (noting that in class action "pattern or practice cases . . . a district court must usually conduct additional proceedings . . . to determine the scope of individual relief"); <u>Smilow</u>, 323 F.3d at 40 (observing that "even if individualized determinations were necessary to calculate damages, Rule (23)(c)(4)(A) would still allow the court to maintain the class action with respect to other issues").  "[W]here common issues otherwise predominated, courts have certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses." <u>Smilow</u>, 323 F.3d at 39-40, and cases cited.  "If, moreover, evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms." <u>Id.</u> (citing <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d at 124, 141 (2nd Cir. 2001) (Sotomayor, J.) (describing procedural options and collecting authorities)).

Finally, it is worth stating explicitly that the Court does not contemplate the type of "Trial by Formula" that the Supreme Court condemned in <u>Dukes</u>, 131 S. Ct. at 2561, and which defendants warn is applicable here.  D. 93 at 14-15.  In the <u>Dukes</u> case, both liability and damages were to be determined based on a "sample set of the class members." 131 S. Ct. at 2561.  "The percentage of claims determined to be valid would then be applied to the entire

remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery — without further individualized proceedings." Id. The Supreme Court reversed class certification, noting that the problematic aspect of this approach was that the defendant company would be held programmatically and probabilistically liable to class members who had not been the subject of any illegal treatment, and there would be no further individualized proceedings available to contest such liability.

Here, in contrast, the plaintiffs' allegations are that the Corporate Defendants had a uniform policy to use a wage system that either was itself, or that caused, wage violations.[9] The remedy, if one is required, likely involves reconstructing the correct wage algorithm. See Smilow, 323 F.3d at 40; see generally 3 Newberg on Class Actions § 10:1 (4th ed. 2002 & Supp. 2012) (describing class action cases where "it is feasible and reasonable to prove aggregate monetary relief for the class from an examination of the defendant's records, or by use of a common formula"). This is not the programmatic and probabilistic determination of liability ("[t]rial by [f]ormula") that was so distasteful in Dukes, 131 S. Ct. at 2561. Here, the Named Plaintiffs must prove actual liability by showing that certain types of alleged actions were violations of state law and by proving that these actions occurred. Moreover, as required, the defendants are entitled to any additional proceedings required to ensure that their due process rights are protected. Id.

---

[9] This difference, namely whether the alleged wage violation comes from use of a particular wage algorithm, or whether the violation only results if the employees are not paid at least their required wages over the pay period, is part of the dispute between the litigants and one question that must be determined in the course of this lawsuit. For example, the defendants assert that "[t]he fixed cash rate for job time that [NWMCC] paid, when combined with the value of the benefits that [NWMCC] provided, was intended to satisfy [NWMCC]'s prevailing wage obligations by ensuring that each week [employees] received compensation at or above the statutory minimums, while allowing them to fill out workable time cards." D. 53 at 4. The plaintiffs argue that "the Defendants are simply incorrect when they claim that the time spent by catch basin cleaners moving from catch basin to catch basin, and then driving back and forth to the dump is not prevailing wage work." D. 60 at 7.

Each of the cases cited by defendants, where courts have found that common questions of law and fact did not predominate over individual issues, are distinguishable.  For example, in Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 339 F.3d 1001, 1012 (8th Cir. 2003), the court affirmed a district court's decision not to certify a class where the only common issue was tied to individual inquiry into the right to recover damages; that is, by operation of law, liability was tied to damages.  See also Guan Ming Lin v. Benihana Nat. Corp., 275 F.R.D. 165, 177-178 (S.D.N.Y. 2011) (same).  In other cases, such as White v. Western Beef Props., Inc., No. 07-CV-2345, 2011 WL 6140512 at *2 (E.D.N.Y. Dec. 9, 2011) and Abla v. Brinker Rest. Corp., 279 F.R.D. 51, 57 (D. Mass. 2011), the courts concluded that liability could only be established by a close examination of the particular circumstances that the defendants had with each individual class member.  Here, in contrast, there are numerous common issues of law and fact that must be resolved even to reach the point where individual issues can even be considered and resolution of the individual issues will depend on answers to the earlier common questions. In Babineau v. Federal Exp. Corp., 576 F.3d 1183, 1191-1192 (11th Cir. 2009), and in Cornn v. United Parcel Serv., Inc., No. C03-2011, 2005 WL 2072091 at *4-5 (N.D. Cal. Aug. 26, 2005), the courts affirmed the district court's decision not to certify class where the Federal Express Corporation and United Parcel Service, Inc., respectively had policies that employees should not work during their break time, but individual employees asserted that they worked during that time anyway.  The district courts ruled that they would not be able to determine liability without a detailed inquiry into each employee's working arrangements.  The issue was similar in Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 602-604 (E.D. La. 2002), where, in addition, the plaintiffs tried to proceed with a statistical damages calculation similar to what was later soundly rejected in Dukes, 131 S.Ct at 2561.  Unlike Babineau, Cornn and Basco, here the allegations

against the Corporate Defendants are that their wage policies facially violated state law, which requires little individual inquiry.  Unlike <u>Basco</u>, the damages inquiry, if required, will account for actual individual damages.  In <u>In re Wells Fargo Home Mortgage</u>, 268 F.R.D. 604, 610-611 (N.D. Cal. 2010), the court refused to certify a class alleging overtime violations where there were "no reliable time records of the actual hours worked" and where the "[p]laintiffs' claims will require inquiries into how much time each individual [employee] spent in or out of the office and how the [employee] performed his or her job; all of this where the [employee] was granted almost unfettered autonomy to do his or her job."  Here, the overtime allegations center around the use of an incorrect formula by the Corporate Defendants to pay overtime based on detailed time records, where the overtime has already paid once and records presumably exist to correct these payments if deemed erroneous.  In <u>Cruz v. Dollar Tree Stores, Inc.</u>, Nos. 07-2050, 07-4012, 2011 WL 2682967 at *6 (July 8, 2011), the court decertified a previously certified class where eighty-five percent of the class stated under oath that either they were not truthful when submitting their weekly payroll certifications, could not recall whether they were truthful when submitting their weekly certifications, or provided no response at all.  In contrast here, the Court has no reason to conclude that the time records in this case are so patently unreliable, especially where many, if not all of the hours worked by the class allegedly were checked by managerial employees of the Corporate Defendants and were subject to further verification.  D. 53 ex. A ¶¶ 12-13 (deposition of Vice President of NWMCC stating that start times were "subject to verification with municipal officials" and that he "would review employees' time cards regularly" on "on rare occasions" would revise "a minimal number of hours"); D. 53 Ex. L (examples of time cards apparently showing secondary approval).

For these reasons, the Court thereby concludes that resolution of these individual issues will be manageable within a class action.  See Fed. R. Civ. P. 23(b)(3)(D).  Moreover, for reasons of consistency and economy – both for the litigants and the courts – these issues should be decided once in a uniform manner on a class basis rather than being repeatedly litigated through individual lawsuits.  See Fed. R. Civ. P. 23(b)(3)(A) (requiring courts to consider "class members' interests in individually controlling the prosecution or defense of separate actions"); Fed. R. Civ. P. 23(b)(3)(C) (requiring courts to consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum").  The Court, therefore, finds that questions of law or fact common to class members predominate over any questions affecting only individual members for the proposed class.  Fed. R. Civ. P. 23(b)(3).

   (b)  <u>The Named Plaintiffs Have Established the Superiority of Class Action</u>

Fed. R. Civ. P. 23(b)(3) also directs the Court to ensure "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Rule directs the Court to consider the same factors, listed above, regarding the "class members' interests in individually controlling" the litigation, the "desirability or undesirability of concentrating the litigation" in this forum, the "likely difficulties in managing a class action [manageability]," and the pendency of any related litigation.  Fed. R. Civ. P. 23(b)(3)(A-D).  The Court's consideration of these matters, considered above in discussing predominance, applies here.

Most relevant here is manageability, since the other factors are not in serious contention. But the Court is "not assessing whether this class action will create significant management problems, but instead [is] determining whether it will create relatively more management problems than any of the alternatives."  <u>Williams v. Mohawk Industries, Inc.</u>, 568 F.3d 1350, 1358 (11th Cir. 2009) (quoting <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1273, (11th Cir. 2004).

The Court finds that a class action lawsuit here would be a better option than multiple individual actions, coordinated individual actions, consolidated individual actions, test cases, or any of the other options of which the Court is aware.  The Plaintiffs have established superiority.

> 4.     *Certifying the Class*

The Named Plaintiffs have met their burden under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3) and the Court certifies the putative class.[10]

Fed. R. Civ. P. 23(c)(1)(B) requires the class certification order to "define the class and the class claims, issues or defenses" and must appoint class counsel under Fed. R. Civ. P. 23(g). The Court has reviewed the various proposals for class certification language.  See D. 50 at 5; D. 53 at 19; D. 60 at 16-17.  The Named Plaintiffs propose a class bringing claims against the Corporate Defendants as follows:

> All past and present prevailing wage-eligible workers employed by NWMCC (and Carylon if proven) who performed work on any contract or subcontract by and between NWMCC and any Massachusetts, Rhode Island or Connecticut entity between December 7, 2006, (or an earlier date as determined by the Court) and the date of entry of judgment, where the payment of prevailing wage rates was required by statute or contract.

D. 60 at 16-17.  The defendants, while opposing class certification, had also argued that if the Court did certify a class, the class "at most" would be defined as:

> [P]revailing wage-eligible workers employed by NWMC[C] who performed work on any contract between NWMC[C] and any entity in Connecticut, Massachusetts or Rhode Island managed by NWMC[C]'s Canton, Massachusetts office between December 7, 2006 and the date of entry of judgment, where the payment of prevailing wage rates was required by statute or contract.

D. 53 at 19.

---

[10] The Named Plaintiffs moved to certify one class rather than the multiple subclasses proposed in the SAC. Compare D. 50 at 5 with D. 38 at 51.  Since this Court is granting the Named Plaintiffs' motion and certifying a single class, it need not address the certification of subclasses that was not sought in the class certification motion. To the extent that the Named Plaintiffs suggested, in the alternative, the certification of separate classes of plaintiffs to address the defendants' concern about potentially different scopes of liability for the Corporate Defendants and the RICO Defendants, D. 60 at 16-17, the Court need not address this argument given its ruling, discussed below, dismissing the RICO claims.

The Court thus defines the class as follows:[11]

> All past and present prevailing wage-eligible workers employed by NWMCC (and Carylon if proven) who performed work subject to any contract or subcontract between NWMCC and any Connecticut, Massachusetts or Rhode Island entity between December 7, 2006, and the date of entry of judgment where the payment of prevailing wage rates was required by statute or contract.

The class claims and issues shall consist of those raised in the Named Plaintiffs' SAC and specifically consist of those claims and issues that support Counts 1 through 9. D. 38.

Pursuant to Fed. R. Civ. P. 23(g) and for the reasons discussed above, the Court appoints F. Henry Ellis, III, and Adam J. Shafran of F.H. Ellis & Associates, P.C. as class counsel.

**B.     The Defendants Are Entitled to Judgment on the Pleadings As to the RICO Claims and the Plaintiffs May Not Amend to Add an Additional RICO Defendant**

Also pending is the defendants' motion for judgment on the pleadings as to Named Plaintiffs' allegations regarding RICO Act violations, breach of contract and unjust enrichment, D. 75, and the Named Plaintiffs' motion to amend to add an additional RICO defendant. D. 86.

The standard for reviewing a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is similar to that used when deciding a motion to dismiss for failure to state a claim upon which relief can be granted.  See, e.g., Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009); Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). "[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

---

[11] December 7, 2006 will be the start of the class period, which is three years prior to the filing date of the class action.  The class period is driven by the statutes of limitations at issue in this case.  The statute of limitations for the Massachusetts prevailing wage statute, Mass. Gen. L. c. 149, §§ 26-27, is three years and is likely to be relevant to most, if not all, of the class members.

The Named Plaintiffs' initial complaint did not allege RICO claims.  D. 1 ex. A.   After initial discovery, the Named Plaintiffs moved to amend their complaint to add two RICO claims, under 18 U.S.C. §§ 1962(a) & (c).  D. 23.  A magistrate judge denied the motion as to amend as to § 1962(a) with prejudice, and the § 1962(c) claim without prejudice, allowing the Named Plantiffs to file a further motion to amend with additional specific allegations to support the § 1962(c) claim.[12]  D. 32.  The Named Plaintiffs filed a new motion to amend that added additional allegations to support the § 1962(c) claim.  D. 33.  The defendants filed no opposition to this motion to amend.  Id.  The magistrate judge granted the unopposed motion to amend without further analysis as to whether the new allegations plausibly pled a violation of § 1962(c), thereby allowing the SAC, which remains the operative complaint, to be filed.  Id., D. 38.

The Court is aware of the "law of the case" doctrine, see, e.g., Arizona v. California, 460 U.S. 605, 618 (1983), decision supplemented, 466 U.S. 144, (1984), which generally states that a "decision should continue to govern the same issues in subsequent stages in the same case."  But the doctrine only "directs a court's discretion, it does not limit the tribunal's power."  Id.  That is, "it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice."  Id. n. 8.  Here the Court concludes, after additional briefing on the matter, that the SAC does not set forth a claim on which relief can be granted and that judgment on the pleadings as to the RICO claim is now appropriate.  The Court notes that this is not the same analysis performed by the magistrate judge in her earlier decision to deny Named Plaintiffs' motion to amend without prejudice, where the magistrate judge concluded that "the pleading deficiency appears curable" and later allowed the amendment without further analysis as to whether the pleading defects had been cured.  They have not, and

---

[12] The magistrate judge denied the motion to amend the RICO claims outright, rather than incorporating the decision into a report and recommendation to the district court.  D. 32 & n.5, 34.  Similarly, the magistrate judge later directly granted the Named Plaintiffs' motion to amend the complaint as to the § 1962(a) claim.  D. 33.

allowing the claims to remain now that they have been challenged would "work a manifest injustice." Id.

The civil RICO statute requires a plaintiff to show injury "by reason of" defendants' predicate "racketeering activity," as defined by 18 U.S.C. §§ 1961-1962.  18 U.S.C. § 1964(c); Pujol v. Shearson/Am. Express, Inc., 829 F.2d 1201, 1205 (1st Cir. 1987).  "To state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 989 (2010) (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).  A plaintiff alleging a § 1964(c) violation "may not succeed merely by proving that the predicate acts were a 'cause in fact' of the plaintiffs' injuries; rather, Section 1964(c) requires that the defendant's specified acts of racketeering were the proximate cause of the plaintiffs' injuries."  George Lussier Enter. Inc. v. Subaru of New England, 393 F.3d 36, 51 (1st Cir. 2004), citing Holmes, 503 U.S. at 268.  The magistrate judge, in deciding to deny the motion to amend without prejudice, found that the Named Plaintiffs could perhaps meet their burden of pleading that the RICO Defendants' actions were the proximate cause of the Named Plaintiffs' alleged injury because "as a direct result of the false representations [that RICO Defendants made to municipalities], the municipalities released funds under the contracts in excess of the amount [NWMCC] actually paid to plaintiffs that was less than the represented rate or amount. The false representations allowed [NWMCC] to continue the scheme of underpaying plaintiffs and avoid detection."[13]

---

[13] The magistrate judge's memorandum, from which this language is quoted, cites two opinions from the same case for support that the conduct described above constituted proximate cause.  D. 30 at 30 (citing System Management, Inc. v. Loiselle, 112 F. Supp. 2d 112, 119 (D. Mass. 2000) and System Management, Inc. v. Loiselle, 138 F. Supp. 2d 78, 93 (D. Mass. 2001), rev'd on other grounds, 303 F.3d 100, 106 & n.7 (1st Cir. 2002).  These opinions were decided before the First Circuit's clarification of the proximate cause requirement in RICO claims in George Lussier Enter. Inc., 393 F.3d at 51 (holding that "indirect and derivative injuries are insufficient" to maintain a RICO claim and giving examples of direct injury).

After further briefing from the parties, this Court concludes that this alleged conduct does not make out proximate cause, and that the SAC still fails to set out a cognizable claim, for five reasons, each of which could be an independent basis for the Court's decision.  First, regardless of the content of the payroll certifications, and whether the municipalities released funds as a result of those certifications, NWMCC itself chose how it would pay its workers and NWMCC itself had the independent obligation to meet prevailing wage and overtime statutory requirements.  The proximate cause of Named Plaintiffs' alleged damages, if any exist, are the Corporate Defendants' wage policies.

Second, the amended allegations in the SAC, D. 38, make clear that the payroll certifications were made <u>after</u> Corporate Defendants' workers had already been paid.  D. 38 ¶¶ 94-197 (quoting various payroll certifications with language such as, "all persons employed on said project have been paid the full weekly wages earned").  It is hard to find proximate cause where, as here, the alleged acts of racketeering "actually <u>followed</u> the loss."  <u>United States v. Christopher</u>, 142 F.3d 46, 53 (1st Cir. 1998) (emphasis in original).  The SAC alleges that the "predicate acts under RICO" were "[t]he RICO Defendants' mailing of each of the knowingly false payroll certifications."  D.38 ¶¶ 130-131.  Thus the SAC itself suggests that there was no proximate cause between defendants' alleged actions and the Named Plaintiffs' alleged harm.

Third, the allegation in the SAC is that the racketeering fraud was conducted on the municipalities and not on the Named Plaintiffs.  SAC ¶¶ 130-131 ("These thousands of acts of mail fraud in the aggregate directly facilitated the RICO Defendants and NWMC's ongoing and continued common plan to <u>defraud the above listed municipalities</u> . . . into releasing the funds to NWMC pursuant to their respective contracts") (emphasis added).  Thus, to the extent that the SAC alleges a fraud with direct injury to the municipalities, the Named Plaintiffs may not step in

and assert those municipalities' rights.  See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460–461 (2006) (noting "[a] direct causal connection is especially warranted where the immediate victims can be expected to vindicate the laws by pursuing their own claims").

Fourth, to the extent that the SAC can be read to allege a theory of "concealment" of wage violations, the First Circuit rejected that theory under more compelling circumstances in George Lussier Enter. Inc., 393 F.3d at 51.  In that case, a distributor of automobiles "concealed" a plan to require its dealers to buy cars bundled with expensive options and accessories.  Id.  The plaintiffs allegedly harmed by the concealment brought suit against the distributor.  The First Circuit rejected that claim, noting that "injury asserted, however, was directly caused by the option-packing scheme, rather than the fraudulent scheme of concealment . . . . Although [the] alleged fraudulent conduct may have contributed to dealers' specific injuries . . . such indirect and derivative injuries are insufficient" to show proximate cause for RICO purposes.  Id.  Here, in contrast, the alleged concealment was one step further removed in that the alleged concealment was as to third parties (the municipalities).

Fifth, even if the Court were to accept the "concealment" theory as a viable way to show a RICO violation under § 1962(c), such a theory is not explicitly pled in the SAC.  Even if it were, the Named Plaintiffs assume that the municipalities, had they known about the alleged wage violations, would have somehow changed their behavior.  Nor is such pled in the SAC.  So the Named Plaintiffs' implicit concealment theory is contingent on third parties' willingness to have stepped in to intervene on the Named Plaintiffs' behalf to have prevented further harm.  See Hemi, 130 S. Ct. at 989 (noting that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.  Our cases confirm that the 'general tendency' applies

with full force to proximate cause inquiries under RICO" (internal quotations and citations omitted)).

Because the necessary proximate causality to establish a RICO violation is missing here, this Court now grants the Defendants' motion for judgment on the pleadings as to the RICO claim.  For the same reason, the Plaintiffs' motion to amend the pleadings to add Paul Leaver ("Leaver") as an additional RICO defendant is denied as moot.  Even were that not so, this Court notes that it would deny the motion to amend the complaint where the Plaintiffs offer no reasonable explanation or justification as to why Leaver was not added earlier as a RICO Defendant.  Presumably, the Named Plaintiffs knew the extent of Leaver's duties at least eight months prior to filing the motion to amend, when the Plaintiffs completed the deposition of Leaver.  See Pl. Mot. Amend, D. 86, at ¶¶ 6-7.  Allowing the motion to amend now, which the Court notes was filed more than 28 months after the initiation of this lawsuit on December 7, 2009, D. 1, 86, and more than two months after discovery ended in this case, D. 64, would work "undue prejudice" to Leaver.  Foman v. Davis, 371 U.S. 178, 182 (1962); see Grant v. News Group Boston, Inc., 55 F.3d 1, 6 (1st Cir. 1995) ("Where considerable time has elapsed . . . the movant has the burden of showing some valid reason for his neglect and delay") (emphasis in original).

### C.      The Defendants Are Entitled to Judgment on the Pleadings With Respect to Alleged Breach of Contract and Unjust Enrichment Claims

The Court grants judgment on the pleadings as to the breach of contract and unjust enrichment claims under Massachusetts law.[14]

---

[14] The Court only grants this motion as to the common law claims alleged under Massachusetts law.  The Court is unable to consider similar arguments with respect to the Connecticut or Rhode Island common law claims simply because the defendants provide no argument as to how those states' statutes interact with the common law of those states.

Under Massachusetts law, it has long been understood that "where a statute has been enacted seemingly intended to cover the whole subject to which it relates, including a remedy for its infraction, other provisions of the common law, including such as are remedial in nature, are thereby superseded." School Comm. of Boston v. Reilly, 362 Mass. 334, 338 (1972) (quoting School Comm. of Lowell v. Mayor of Lowell, 265 Mass. 353, 356 (1928)); see Dobin v. CIOview Corp., No. 2001-00108, 2003 WL 22454602 at *9 (Mass. Super. Ct. Oct. 29, 2003) (Gants, J.) (noting that "when the Legislature has provided a statutory cause of action . . . there is no need to add a common law remedy").

Here, the rights asserted (prevailing wage and overtime) are creatures of statute, and the statutes provide limited windows and mechanisms in which to seek benefits. The statutes are also specific as to what remedy is provided on violation of the statutes. See, e.g., Mass. Gen. L. c. 149, § 27 (prevailing wage) (providing that "[a]n employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees."); Mass. Gen. L. c. 151, § 1B (overtime) (reciting same language). Notably, these statutes also provide the same remedy as the Massachusetts "Tips" Statute, Mass. Gen. L. c. 149, § 152A, as expressed at Mass Gen. L. c. 149, § 150 (stating same language) which has been held to be the sole remedy to the exclusion of common law claims. See Hernandez v. Hyatt Corp., No. SUCV-2005-0569-BLS1 at *8 (Mass. Super. Ct. May 4, 2009) (Hinkle, J.); Godt v. Anthony's Pier 4, Inc., No. SUCV-2007-3919-BLS1 at *8 (Mass. Super. Ct. Mar. 24, 2009) (Hinkle, J.); DePina v. Marriott Int., Inc., No. SUCV-2003-05434-G at *18-20 (Mass. Super. Ct. July 28, 2009) (Henry, J.); Mouiny v. Comm. Flats Dev. Corp., No. SUCV-2006-1115-BLS1 at *14-15 (Mass. Super. Ct. Aug. 20, 2008) (Gants, J.) ("The plaintiffs have asserted a number of common law claims . . .

. If they fail to prevail on their Tips Act claim, they will be unable to prevail on their common law claims.  In short, the plaintiffs' case rises or falls on their Tips Act claim, and the common law claims are mere surplusage, of no legal consequence").  The Named Plaintiffs argue that the "Tips Act" cases are distinguishable and that prevailing wage claims are different because the Named Plaintiffs, by statute, must receive prevailing wage benefits and thus are third-party beneficiaries.  The Court sees no distinction between the "Tips Act" and "prevailing wage" statutes as to the enforcement remedies available to employees.  Each statute creates a mandatory wage term, imposed on employers by law.  Moreover, just like the duty created under the "Tips Act," the "duty [to pay prevailing wages] which the plaintiff[s] seek[] to enforce is wholly a creature of statute and did not exist at common law."  School Comm. of Boston v. Reilly, 362 Mass. at 338.  This Court agrees with these rulings where the "plaintiffs' common law claims are mere surplusage [where] they needlessly duplicate the remedies available under the statute." DePina, No. SUCV-2003-05434-G at 19.  But see Tomei v. Corix Utils. (U.S.) Inc., No. 07-cv-11928-DPW, 2009 WL 2982775 at *19 (D. Mass. Sept. 14, 2009) (holding that employee could maintain "separate third-party beneficiary contract claim" but noting that "[n]either party has cited, and I have not found, any Massachusetts cases which confront the issue of preclusion for the prevailing wage statute").

The plaintiffs additionally rely on an unpublished decision from the Massachusetts Superior Court Appellate Division, Spears v. Miller No. 1683, 2006 WL 2808145 (Mass. App. Div. September 26, 2006).  To the extent that the Spears opinion has persuasive value as to how this Court should interpret Massachusetts law, its influence would be limited only to the Named Plaintiffs' contentions regarding overtime.  But even on that topic, Spears addresses a different scenario than what is alleged by Named Plaintiffs.  The Named Plaintiffs here do not allege that

they were not paid for their overtime work.   Contrast Spears 2006 WL 2808145 at *1 ("[Plaintiffs] argue it is 'the fact of non-payment of overtime wages' and 'not the illegality of the conduct' that underlies their theories of recovery.") (emphasis added).   Here, the Named Plaintiffs allege that they were entitled to a statutorily prescribed amount of overtime:  namely, the "one and one half times the regular rate" as provided by Mass. Gen. L. c 151.   See D. 38 ¶¶ 228-229, 233 (seeking payment of "correct" prevailing and overtime rate[s]).   The Named Plaintiffs are exclusively in the bounds of the benefits and limitations provided by statute if they are successful on the merits of their claims.

For these reasons, the breach of contract and unjust enrichment claims arising under Massachusetts law are dismissed.

## V.    Conclusion

For the foregoing reasons, the Court GRANTS the Named Plaintiffs' motion for class certification (D. 49) subject to the terms in this Order.  The Court GRANTS Defendants' motion for judgment on the pleadings (D. 75) as to the RICO claims (Count 12) and as to breach of contract (Count 10) and unjust enrichment (Count 11) claims arising under Massachusetts law. The Court DENIES Named Plaintiffs' motion to amend the complaint (D. 86) to add an additional RICO Defendant.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge