**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|   |   |
|---|---|
| **ROBERT GEORGE, MICHAEL CURVIN,** ) | |
| **MARK BASSETT, KEVIN COLVIN, KEVIN** ) | |
| **FREEMAN, JUSTIN KORDAS, CARLOS** ) | |
| **VILLARREAL, PAUL DOCKETT, JON** ) | |
| **ELDRIDGE, CHRIS MYERS, ZEF ZEKA,** ) | |
| **PAUL LEDOUX, ERIC PAIVA, JEFFREY** ) | |
| **DAVID and CHRIS MIRISOLA,** ) | |
| **on behalf of themselves and others** ) | |
| **similarly situated,** ) | |
| ) | **Civil Action No. 10-10289-DJC** |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NATIONAL WATER MAIN CLEANING CO.** ) | |
| **and CARYLON CORP.,** ) | |
| ) | |
| **Defendants.** ) | |

_____)

**MEMORANDUM AND ORDER**

CASPER, J.                                                          September 16, 2013

## I.      Introduction

In this class action lawsuit, the Plaintiffs allege that their employers National Water Main

Cleaning Company ("NWMCC") and Carylon Corporation ("Carylon") (collectively, the

"Defendants") failed to pay legally mandated wages and benefits to employees working in

Massachusetts, Connecticut and Rhode Island.     Both the Plaintiffs and the Defendants have

moved for partial summary judgment.  D. 121; D. 123.  For the reasons given below, the Court

GRANTS in part and DENIES in part each of those motions.[1]

---

[1] There is a pending motion for reconsideration of the Court's class certification decision,
D. 160 and a pending motion for sanctions by the Plaintiffs against the Defendants, D. 166 (and

## II.     Background

The Court assumes that the reader is familiar with the factual and procedural background of this lawsuit, as described in George v. Nat'l Water Main Cleaning Co., 286 F.R.D. 168, 170-73 (2012).  The Plaintiffs in this lawsuit are current and former employees of the Defendants who inspect and clean state and municipal sewer systems.  Id. at 170-71.  One task performed by many of the Plaintiffs is "catch basin cleaning," which involves removing debris from the entry point of sewer systems.  Id. at 171.

> A catch basin is an opening to the storm drain system that typically includes a grate at street level where storm water enters the catch basin and a sump that captures sediment, leaves and other debris so that it does not enter the storm drain system. . . . Catch basins must periodically be cleaned so that the sediment does not rise beyond the level of the sump and enter the drain system.

Pl. Resp. to Def. St. of Facts, D. 137 ¶¶ 2, 4.  NWMCC performs much of this work under contract for city and state entities such as the Boston Water and Sewer Commission ("BWS") and the Massachusetts Highway Department ("MHD") and so "a significant number of NWMCC's contracts are subject to Massachusetts' prevailing wage and overtime wage laws." D. 137 ¶¶ 5-7 ; Def. Resp. to Pl. St. of Facts, D. 142 ¶¶ 1-2.

### A.     Cleaning Sewer Catch Basins

NWMCC performs much of its catch basin cleaning work using a catch basin cleaning truck, which is a dump truck fitted with a telescoping hydraulic boom operated by a power takeoff ("PTO") drive mounted directly to the transmission of the truck.  D. 137 ¶¶ 17-18.  At the end of the boom, there is a mechanical bucket called an orange peel bucket.  D. 137 ¶ 20.  There are levers on the side of the truck to operate the boom and bucket.  D. 137 ¶ 29.  A NWMCC employee prepares to clean a catch basin by parking the truck next to the catch basin, turning on

---

Defendants' motion to strike that motion for sanctions, D. 170.  Today's Memorandum and Order does not address those motions.

the PTO drive, removing the cover of the catch basin and swinging the boom of the truck toward

the catch basin using levers located on the side of the truck.  D. 137 ¶ 33.  Using the levers, the

employee then lowers the orange peel bucket in a closed position into the catch basin, opens and

closes the orange peel bucket inside the catch basin to pick up debris, raises the orange peel

bucket and finally dumps the bucket's contents into the body of the dump truck.  D. 137 ¶ 34.

NWMCC also uses "jet-vac" trucks to clean catch basins and sewer lines.  D. 142 ¶ 18.[2]  Unlike

catch basin cleaning trucks that scoop up debris using a mechanical bucket, the "jet-vac" truck

sucks up debris out of a catch basin through a truck-mounted vacuum tube into an internal

storage tanker located on the truck.  D. 142 ¶¶ 13, 19-21. An employee performing catch basin

cleaning work will need to drive to a waste collection facility and empty the body of the truck at

least once during the day and the worker may need to do so multiple times each day.  D. 137

¶ 37.

        The  exact  manner  that  NWMCC  assigns  its  employees  the  set  of  catch  basins  to  be

cleaned varies by the customer.  For example, BWS designated specific catch basins for cleaning

and provided maps showing the locations of those catch basins to NWMCC.  D. 137 ¶ 11.

NWMCC assigned sets of maps to its employees and the employees turned in those maps and

were assigned new ones as they finished cleaning the catch basins shown on each map.  D. 137

¶ 12.  In contrast, for example, MHD specified road segments in their contracts with NWMCC

that contained catch basins to be cleaned.  D. 137 ¶ 16.  MHD then assigned inspectors who

dictated  the  specific  set  of  catch  basins  to  be  cleaned  each  day  to  NWMCC  employees.  Id.

---

        [2] The  parties  dispute  whether  "jet-vac"  trucks  are  also  known  as  "vac  haul"  trucks.
D. 142 ¶¶ 18-21.  The dispute is not over a material fact where the Defendants assert that
"NWMCC currently applies the Vac-Haul/Catch Basin Cleaning rate to jet vac work and . . .
does not dispute application of those rates for purposes of this litigation."  D. 141 at 4 n.6; D.
142 ¶ 23 (stating that "NWMCC applies the 'vac haul/catch basin cleaner' classification for
employees operating a jet vac or catch basin cleaner").

NWMCC's catch basin cleaning contracts with its customers contain provisions covering the proper methods for disposal of catch basin debris.  D. 142 ¶ 17; see, e.g., D. 124 Exh. 6 at 2 (contract between NWMCC and BWS specifying a particular facility that will receive catch basin waste).

### B.    **Prevailing Wage**

#### *1.    Statutory Framework*

Massachusetts has a comprehensive statutory scheme to set minimum wages on public works projects.  Mass. Gen. L. c. 149, §§ 26-27F.  See, e.g., Constr. Indus. of Mass. v. Comm'r of Labor & Indus., 406 Mass. 162, 167 (1989) (noting that "General Laws c. 149, §§ 26–27F, comprise a comprehensive legislative enactment"); Commonwealth v. W. Barrington Co., 5 Mass. App. Ct. 416, 419-20 (1977) (noting the "framework and the subject matter of related provisions [to § 27F] found in G.L. c. 149" relate to the payment of minimum wages "to public employees as well as the employees of private contractors who are engaged in the construction of public works").  Two provisions that are part of this framework, Mass. Gen. L. c. 149, §§ 26, 27, require that the prevailing wage set by the director of the Department of Labor Standards ("Department") be paid to affected employees performing under municipal contracts.[3]  Mullally v. Waste Mgmt. of Mass., Inc., 452 Mass. 526, 528-29 (2008).  More specifically, § 27 requires that all workers performing identified jobs on "public works" construction projects be paid pursuant to a wage schedule set by the Department.  Section 26 requires the Department to consider and incorporate, inter alia, any "wage rates have been established in certain trades and

---

[3] The Massachusetts Department of Labor Standards ("DLS") was formerly known as the Massachusetts Division of Occupational Safety ("DOS") and the Massachusetts Department of Labor and Industries ("DLI").  When referring to past decisions and orders, this opinion refers to these organizations collectively as the "Department."  The statutory scheme defines the "commissioner" as the director of the Department of Labor Standards.  Mass. Gen. L. c. 149, § 1.

occupations by collective agreements or understandings in the private construction industry between organized labor and employers." Mass. Gen. L. c. 149, § 26. The provision at issue, Mass. Gen. L. c. 149, § 27F, requires that where a "truck or any automotive or other vehicle or equipment is to be engaged in public works" that appropriate wages "be paid to the operators of said trucks, vehicles or equipment."[4] Unlike § 27, § 27F is not limited to public works involving construction. See, e.g., W. Barrington Co., 5 Mass. App. Ct. at 419-20 (discussing wider applicability of § 27F compared to § 27). "[E]mployers of labor [and] members of a labor organization" are entities that may appeal "wage determination[s] or a classification of employment as made by the [Department]." Mass. Gen. L. c. 149 § 27A. Such appeals must be brought "[w]ithin five days from the date of the first advertisement or call for bids." Id.

### 2.    Prevailing Wage Schedules Affecting These Parties

The parties agree that a "significant number" of NWMCC's contracts relevant to this litigation are subject to Massachusetts' prevailing wage and overtime wage laws. D. 142 ¶ 2; see, e.g., D. 126 Exh. 16 at 22-23 (prevailing wage rate schedules for particular catch basin cleaning projects). For example, NWMCC's September 2005 and October 2006 contracts with BWS include prevailing wage schedules listing rates for 29 different classifications, including

---

[4] Mass. Gen. L. c. 149, § 27F provides in relevant part:

No agreement of lease, rental or other arrangement, and no order or requisition under which a truck or any automotive or other vehicle or equipment is to be engaged in public works by the commonwealth or by a county, city, town or district, shall be entered into or given by any public official or public body unless said agreement, order or requisition contains a stipulation requiring prescribed rates of wages, as determined by the commissioner, to be paid to the operators of said trucks, vehicles or equipment. Any such agreement, order or requisition which does not contain said stipulation shall be invalid, and no payment shall be made thereunder. Said rates of wages shall be requested of said commissioner by said public official or public body, and shall be furnished by the commissioner in a schedule containing the classifications of jobs, and the rate of wages to be paid for each job.

rates designated "laborer," "clamshell/slurry bucket/heading machine," and "vac haul."  D. 137 ¶ 74.  The "laborer" hourly wage rate is one of the lowest rates on the wage sheet, while the "clamshell/slurry bucket/heading machine" is one of the highest.  D. 126 Exh. 16 at 22-23 (prevailing wage schedules); D. 137 ¶¶ 74-77.  The "vac haul" rate (later changed, as described below, to the "vac haul/catch basin cleaning" rate) is set at an amount between these two rates.  D. 126 Exh. 16 at 22-23.  The rate sheets provide no further description of the work that falls into each classification, although the Plaintiffs argue that the "classification title itself provides an implicit description of the work that falls under each classification."  D. 137 ¶ 75.[5]

In 2006, an investigator from the Massachusetts Attorney General's offices sought the Department's guidance on the correct classification of catch basin cleaning work when responding to a complaint made by one of NWMCC's employees.  D. 137 ¶ 90.  Following an investigation, an attorney for the Department concluded that NWMCC had not violated Massachusetts prevailing wage law by paying the "laborer" rate to its catch basin cleaning employees.  D. 137 ¶ 91; D. 126 Exh. 16 at 30-31.  The Plaintiffs assert that NWMCC had provided false information about its cleaning trucks in that investigation.[6]  Id.  Regardless, in a

---

[5] It appears that most (but not all) of the 29 classifications listed are tied to the specific machinery used by a worker.  See D. 126 Exh. 16 at 22-23.  As discussed further infra, after 2006 the "Vac Haul" entry on the prevailing wage table appears as "Vac-Haul / Catch Basin Cleaning."  See, e.g., D. 126 Exh. 16 at 28 (prevailing wage schedule applicable to BWS job dated August 18, 2008).

[6] The Plaintiffs argue that this investigation was flawed where NWMCC allegedly had submitted to the Department a letter containing false information regarding the catch basin cleaning truck specifications,  D. 137 ¶ 91; Pl. Opp. to Def. Mot., D. 136 at 15-18 (stating that NWMCC's "description of the clam shell specifications and . . . representation to [the Department] that the . . . [t]ruck operators are not required to have a hoisting license were false"); Def. Mem., D. 144 at 11 (opposing Plaintiffs' characterization), and where the Department attorney allegedly had an "inaccurate" position as to scope of a particular collective bargaining agreement, D. 136 at 15-17 (arguing that the Department's conclusions in 2006 were erroneous).

memorandum to file dated November 13, 2006 titled "[o]range [p]eel bucket trucks used for

catch basin cleaning," a Department attorney wrote that:

> We had a question as to what classification should be used for the use of these
> trucks to clean catch basins.
>
> Typically, catch basins are cleaned using vac-haul trucks (sometimes referred to
> as vactor trucks).  Sometimes, these trucks with orange peel buckets are used.
> The operator of the truck stands beside it, operating a lever that lowers and raises
> the bucket into and out of the catch basin. . . .
>
> It was determined that, since there is an established rate in the building trades
> agreements for this function (vac-haul rate in the Teamster agreement) that we
> will use this rate for catch basin cleaning, whether a vac-haul or orange peel
> bucket truck is used.  This is consistent with the practice that when a building
> trade agreement has an established rate, it is used on the 27F sheets.
>
> We will establish a "Vac-Haul/Catch Basin Cleaning" rate on both the 27 East
> and 27 West wage schedules.

D. 126 Exh. 16 at 33.  The parties agree that in this memorandum the Department attorney stated

an intention to create a new classification "vac haul/catch basin cleaner" to apply to this type of

work.  D. 137 ¶ 92.  Sometime after 2006, the Department re-named the "vac haul" rate to be the

"vac haul/catch basin cleaner" rate, D. 137 ¶ 78; D. 126 Exh. 16 at 28 (prevailing wage rate

schedule issued in 2008 for a catch basin cleaning project).

### 3.    The Department's March 2010 Prevailing Wage Opinion Letter

Shortly after this lawsuit was filed, Plaintiffs' counsel requested opinion letters from the

Department regarding the job classifications applicable to catch basin cleaning work.  D. 125 at 6

(citing D. 142 ¶ 24).  Plaintiffs' counsel's letter to the Department states that NWMCC workers

used "clam-shell" equipment.  D. 145 Exh. 2 at 2 (stating that "employees performed the catch

basin cleaning work with 'clam-shell' equipment" and asking for "the correct job classification

for workers performing catch basin cleaning work, but performing such work with Clam Shell

equipment").  Plaintiffs' counsel asked if "laborer" was the correct job classification for such

work, and offered Plaintiffs' interpretation as to the applicability of the "clamshell/slurry bucket/heading machine" rate to catch basin work.  Id.

In opinion letter PW-2010-05-03.31.10 (March 31, 2010), the Department responded that "the 'Laborer' classification was not the correct classification for catch basin cleaning work performed using 'Vac Haul' equipment and/or 'clamshell' equipment."  D. 124 Exh. 9 at 1 (also available at http://www.mass.gov/lwd/labor-standards/prevailing-wage-program/opinion-letters/2010/pw-2010-05-033110.html).  The letter also described equipment that is not the same as the equipment used by Plaintiffs in this lawsuit, stating:

> As you note, catch basin cleaning may also be performed using "clamshells."  We understand that there are two types of clamshell trucks.  The type that is generally used for catch basin cleaning has a cable that runs up the boom.  The boom is manually operated from inside the cab of the truck using pedals and levers.  The proper classification for work performed with such equipment is the "Clamshell/Slurry Bucket/Heading Machine" rate as indicated on the rate sheet, established pursuant to the collective bargaining agreement between the Operating Engineers, Local 4 and the Labor Relations Division of Construction Industries of Massachusetts et al.

Id.  There is no dispute that the Plaintiffs did not use a truck with a "boom . . . manually operated from inside the cab of the truck using pedals and levers" in their catch basin cleaning activities. D. 137 ¶¶ 27-29.  Contrast D. 126 Exh. 16 at 33 (internal Department memorandum describing "trucks with orange peel buckets [where] [t]he operator of the truck stands beside it, operating a level that lowers and raises the bucket into and out of the catch basin [and stating] that we will use [the] rate for catch basin cleaning, whether a vac-haul or orange peel bucket truck is used").

Approximately five months later, on September 2, 2010, Plaintiffs' counsel e-mailed the author of the Department opinion with a photograph of a truck and stated, "[a]s you can see the truck meets the above quoted description with the exception that the boom is manually operated from outside the cab of the truck using just levers.  Accordingly, would you please advise if the

8

job classification 'Clamshell/Slurry Bucket/Heading Machine' applies to vehicle [sic] depicted in the attached photograph." D. 124 Exh. 14 at 1-2. The Department representative replied, stating "[t]he photograph attached to your email is a 'clamshell' truck and the proper classification for the operator of such truck would be 'Clamshell/Slurry Bucket/Heading Machine.'" D. 124 Exh. 14 at 3.

      C.    **<u>Cross-Motions for Summary Judgment</u>**

The parties have now cross-moved for partial summary judgment. D. 121; D. 123. First, the Plaintiffs seek a ruling "establishing the correct prevailing wage job classification for the type of work performed by the Defendants' workers in Massachusetts." Pl. Mem., D. 125 at 2.[7] The Defendants in contrast "only ask for a ruling that the 'clamshell/slurry bucket' rate does not apply to work performed using a catch basin cleaning truck [but] do <u>not</u> ask the Court to make a further determination regarding the alternative rate that does apply to this work." Def. Sur-Reply, D. 159 Exh. 1 (citing Def. Mem., D. 127 at 21) (emphasis in original); D. 123 at 1-2. Second, the Plaintiffs seek a ruling "establishing that the Defendants are required to pay prevailing wage rates during the time their workers drive their catch basin cleaning trucks from one catch basin to the next, and to and from municipal dumps when performing their daily catch basin cleaning routes." D. 125 at 2. The Defendants seek a ruling "that time spent away from the site of a public work is not compensable at prevailing wage rates [and that] [t]ravel time at the beginning of the workday, at the end of the day, to waste collection facilities, and between

---

[7] Though Plaintiffs' motion is arguably broadly framed to address <u>all</u> "type[s] of work performed by the Defendants' workers in Massachusetts," the Plaintiffs focused on workers performing catch basin cleaning and the "job classification for operators of trucks used to inspect, repair and reline sewer pipes." D. 125 at 6. This Court further limits its ruling to the "classification of workers performing catch basin cleaning" because the Defendants concede that "NWMCC currently applies the Vac-Haul/Catch Basin Cleaning rate to jet vac work and the 2-axel rate to sewer inspection work involving a 2-axel box truck, and it does not dispute application of those rates for purposes of this litigation." D. 141 at 4 n.6.

job sites—including between catch basins—therefore must be excluded when determining the prevailing wages due to Plaintiffs."  D. 123 at 2.  The Court held a hearing on the cross motions for summary judgment on May 15, 2013 and took the matters under advisement.  D. 182.

## III.    Standard of Review

A moving party is entitled to summary judgment where there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). "[A] court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56."  Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991).

## IV.    Discussion

### A.    Mass. Gen. L. c. 149 § 27F is Not An Unconstitutional Delegation of Authority under Art. 30 of the Massachusetts Declaration of Rights

As a preliminary matter, the Defendants argue that the Court need not reach either the wage classification or the travel time questions because Mass. Gen. Laws c. 149, § 27F is constitutionally defective under Article 30 of the Massachusetts Declaration of Rights as an improper delegation of legislative power.  D. 127 at 10; D. 144 at 3, 16.  The Defendants argue that because § 27F "provides no procedure for assigning the correct classification and rate to a particular job, and . . . makes no express reference to the procedures outlined in . . . §§ 26 and 27, [t]he statute's failure to set out any guidelines renders it an unconstitutional delegation of legislative authority under the Massachusetts constitution."  D. 127 at 11.

Article 30 of the Massachusetts Declaration of Rights provides that "the executive [and judicial branch] shall never exercise the legislative . . . powers."  Mass. Const. pt. 1, art. XXX. "However, 'separation of powers does not require three 'watertight compartments' within the government.' . . . The question whether a specific delegation of power violates the Constitution is a 'question of degree.'"  Commonwealth v. Clemmey, 447 Mass. 121, 134-35 (2006) (quoting Opinions of the Justices, 372 Mass. 883, 892 (1977) and Constr. Indus. of Mass. v. Comm'r of Labor & Indus., 406 Mass. 162, 171 (1989)).  The Supreme Judicial Court has reiterated that:

> "[n]o formula exists for determining whether a delegation of legislative authority is 'proper' or not," but three factors "bear on our determination: (1) [d]id the Legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the local authority is to develop the standards, sufficient guidance to enable it to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?"

Murphy v. Mass. Turnpike Auth., 462 Mass. 701, 709-10 (2012) (quoting Clemmey, 447 Mass. at 135).  Before considering those questions, the Court notes that Mass. Gen. Laws c. 149, § 27F is not an isolated statutory provision, but is part of the "comprehensive legislative enactment" addressing prevailing wages.  Constr. Indus. of Mass., 406 Mass. at 167.  Massachusetts appellate courts have considered this framework when analyzing its respective provisions.  See, e.g., id.; W. Barrington Co., 5 Mass. App. Ct. at 419-20.[8]  The Supreme Judicial Court has upheld the constitutionality of §§ 26, 27 and found that these similar provisions did not constitute

---

[8] The Defendants claim that the W. Barrington Co. case stands as an example where "a Massachusetts court has rejected the importation of concepts from §§ 26 and 27 into § 27F absent express statutory language" and that "[i]t would be inconsistent to read section § 27 into § 27F for some purposes but not all purposes."  D. 127 at 12 (emphasis in original).  The W. Barrington court, however, focused on the existence of a cohesive prevailing wage "framework," and in doing so held that applying a "construction" requirement to § 27F from § 27 "overlooks the framework" and "would have [made § 27F] completely unnecessary" within the scheme.  W. Barrington Co., 5 Mass. at 419-20.

an unlawful delegation of legislative power in violation of Art. 30 of the Massachusetts Declaration of Rights.  Constr. Indus. of Mass., 406 Mass. at 171-73.

Turning to the three questions laid out above, the Court concludes that the statute's delegation to the Department to set prevailing wage schedules was permissible.  First, the Massachusetts legislature did not delegate the making of fundamental policy decisions; rather, its legislative framework gave clear directives as to how the Department was to proceed.  For example, Mass. Gen. L. c. 149, § 26 ties wage rates, inter alia, to "wage rates [that] have been established in certain trades and occupations by collective [bargaining] agreements."  The Defendants correctly observe that there is no literal statutory requirement to apply § 26 to § 27F (unlike § 27, which does explicitly mention § 26) but acknowledge that the Department in fact applies § 26 when implementing § 27F.  D. 127 at 11 n.14.[9]  Moreover, other sections within the framework that apply to § 27F such as § 27A, are not explicitly mentioned in § 27F (or § 27, for that matter).[10]  These observations are consistent with the conclusion the Court now reaches that, read in context, the prevailing wage statutory framework lays out the fundamental policy decisions that constrain § 27F, and leaves the implementation to the Department.

For similar reasons, the prevailing wage framework provides adequate direction for implementation by directing the Department about how to proceed in formulating prevailing wage schedules.  For example, § 27F specifies who are to receive prevailing wages ("operators

---

[9]  The Defendants' observation is further supported by the Department's official prevailing wage rulings and internal memoranda.  See, e.g., D. 124 Exh. 10 at 1 (PW-2010-06-04.30.10, dated April 30, 2010), (also available at http:// www.mass.gov/lwd/labor-standards/ prevailing-wage-program/opinion-letters/2010/pw-2010-06-043010.html); D. 136, Exh. 16 at 33 (internal Department memorandum stating that using "an established rate in the building trades agreements . . . is consistent with the practice that when a building trade agreement has an established rate, it is used on the 27F sheets").

[10]  Indeed, § 27F does not mention the words "prevailing wage" although it is clear from surrounding statutes and case law that this is the type of wage schedule that is required by § 27F.

of said trucks, vehicles or equipment") and what they must contain ("[s]aid rates of wages shall include payment to health and welfare plans"), which in context of § 26 and the rest of the framework gives the Department sufficient guidance about how to formulate the wages.  Finally, § 27F provides adequate safeguards to protect against any abuse of discretion.  Mass. Gen. L. c. 149 § 27A lays out a separate appeal provision applicable to § 27F that provides a public hearing and a first safeguard against an abuse of discretion.  Although "the prevailing wage law contains no provision for judicial review," a party may seek certiorari for a judicial determination of whether the Department's exercise of its discretion was arbitrary or capricious.  See, e.g., Teamsters Joint Council No. 10 v. Dir. of Dep't. of Labor and Workforce Dev., 447 Mass. 100, 110 (2006) (reviewing decision by the Department and "conclud[ing] that the decision was not arbitrary or capricious").

For all of the aforementioned reasons, the Court concludes that § 27F is not an unconstitutional delegation of legislative power under Art. 30 of the Massachusetts Declaration of Rights.

### B.    Correct Prevailing Wage Classification for Catch Basin Cleaning

In their cross-motions for summary judgment, the Plaintiffs seek a ruling establishing the correct prevailing wage job classification for catch basin cleaning work, Pl. Mem., D. 125 at 2, and the Defendants seek a ruling that the "clamshell/slurry bucket" rate does not apply to such work, D. 127 at 21.  For the reasons stated below, the Court holds that there is no genuine dispute of material fact regarding this issue and that as a matter of law, (1) the minimum applicable rate of payment to workers cleaning catch basins using catch basin trucks on projects subject to prevailing wage schedules where there was no "catch basin cleaning" rate is "laborer"; (2) the minimum applicable rate of payment to workers cleaning catch basins using catch basin

trucks on projects subject to prevailing wage schedules where there is a "catch basin cleaning" rate is "catch basin cleaning."

### 1. The Plaintiffs' Wages Are Governed By the Prevailing Wage Schedules

The Court starts from the unchallenged and statutorily-grounded premise that the prevailing wage schedules that were part of the parties' contracts govern the wage obligations of the Defendants to the Plaintiffs. See Mass. Gen. L. c. 149, § 27F (stating that "[a]ny such agreement, order or requisition which does not contain [a] stipulation ['requiring prescribed rates of wages'] shall be invalid"). There is no dispute as to what the prevailing wage schedules in this case state as the wage classifications. D. 137 ¶ 74; D. 142 ¶ 22. Rather, the dispute is which wage classifications are relevant and that determination is a matter of law vested in the Department charged with formulating the schedules. Felix A. Marino Co. v. Comm'r of Labor and Indus., 426 Mass. 458, 461 (1998) (observing that "[t]he prevailing wage law assigns to the commissioner the classification of employment and states that the commissioner's decision is final"). The courts respect those determinations unless it is shown that such determination is arbitrary or capricious.[11] Teamsters Joint Council No. 10, 447 Mass. at 106 (citing Box Pond Ass'n v. Energy Facilities Siting Bd., 435 Mass. 408, 412 (2001)). "A decision is not arbitrary or capricious unless there is no ground which 'reasonable [people] might deem proper' to

---

[11] The Plaintiffs argue that "[t]his Court does not have jurisdiction" to hear what the Plaintiffs characterize as the Defendants' challenge to the Department's prevailing wage classifications where the Defendants have not exhausted their administrative appeals under Mass. Gen. L. c. 149, § 27A. D. 125 at 10-17. But the Defendants do not appear to be challenging the prevailing wage schedules per se and, instead, dispute the Plaintiffs' allegation that NWMCC misapplied prevailing wage schedules. See D. 142 ¶ 23 (asserting that "NWMCC applies the 'vac haul/catch basin cleaner' classification for employees operating a jet vac or catch basin cleaner"). To the extent that the Plaintiffs characterize "the Defendants [as] seek[ing] to challenge the [Department's] official opinion" letter discussed infra, D. 125 at 13, the opinion letter is not subject to Mass. Gen. L. c. 149, § 27A, a statute applicable to appeals of prevailing wage schedules brought "[w]ithin five days from the date of the first advertisement or call for bids."

support it." <u>Teamsters Joint Council No. 10</u>, 447 Mass. at 106 (citing <u>Cotter v. Chelsea</u>, 329 Mass. 314, 318 (1952)).  Finally, even when an administrative agency is not a party in a lawsuit, "[a]n administrative interpretation developed during, or shortly before, the litigation in question is entitled to less weight than that of a long-standing administrative interpretation of administrative rules." <u>Mullally</u>, 452 Mass. at 533 & n.13 (citations omitted).

> 2.    *The Correct Prevailing Wage for Catch Basin Cleaning is "Catch Basin Cleaning," or in the Years Before That Classification Existed, "Laborer"*

The Plaintiffs seek a determination that the "Clamshell/Slurry Bucket/Heading Machine" rate applies to the catch basin cleaning trucks and that this determination "must be applied retroactively" to jobs performed starting in 2006.  D. 136 at 18-19.  But the undisputed facts here are that the Department in 2006 found that NWMCC had not violated the prevailing wage provisions by paying catch basin cleaners at the "laborer" rate, and that the Department later propagated a new "catch basin cleaning" prevailing wage rate for work utilizing the catch basin cleaning trucks.  Specifically, after an investigation in 2006, a Department attorney concluded that NWMCC had not violated the prevailing wage law by paying the "laborer" rate to its employees using catch basin cleaning truck equipment where the "operator of the truck stands beside [the truck], operating a level that lowers and raises the bucket into and out of the catch basin" to clean catch basins.  D. 137 ¶ 91; D. 126 Exh. 16 at 30-31; 33.  In 2006, the Department also planned to propagate a "catch basin cleaning" rate that would be applicable in the future.  D. 137 ¶ 91; D. 126 Exh. 16 at 31, 33.

The Court disagrees with the Plaintiffs that the March 2010 Department opinion letter or the subsequent "clarification" e-mail requires a different result.  The Department's opinion letter was prompted by a request for "the correct job classification for workers [using] Clam Shell equipment."  D. 145 Exh. 2 at 2.  As the Plaintiffs recognized, the formal opinion letter in

response describes different equipment than what is at issue in this litigation. The informal follow-up e-mail was not directed to the Defendants and not shared as an opinion letter or through other official means,[12] did not provide the Defendants with notice of this supposed classification, was responding to the premise that "the truck meets the above quoted description," i.e., a clam shell truck, and (even, applying the Plaintiffs' interpretation of the e-mail) would directly contradict the Department's position of creating and continuing to propagate a published "catch basin cleaning" wage category. Moreover, even if the Court were to try to accord the e-mail the same weight as a formal opinion letter, the clarifying e-mail does not offer any basis for its conclusion that "the photograph attached to your email is a 'clamshell' truck" and does not rely upon any objective source, such as a collective bargaining agreement, to make this determination. Cf. Felix A. Marino, 426 Mass. at 460-61 (affirming Department's classification where the Department "identified collective bargaining agreements in the private construction industry that, in the [D]epartment's view, controlled the wages that [an employer] should pay because they concerned job classifications and wage rates that the [D]epartment believed to be comparable to the work performed by [the employer's] employees"); Mass. Gen. L. c. 149 § 26 (tying wages to any "wage rate or wage rates [that] have been established in certain trades and occupations by collective agreements or understandings in the private construction industry").

Moreover, Plaintiffs' counsel requested the opinion letter from the Department after filing this lawsuit, stating that counsel "represents a class of employees." D. 145 Exh. 2 at 2. Plaintiffs' counsel asked the Department to assist the Plaintiffs in this litigation. See D. 126 Exh. 16 at 35-36 (e-mail from Plaintiffs' counsel to the Department's opinion letter author referencing prior communications and suggesting the type of letter that would be "extremely helpful" to

---

[12] The Defendants contend that the e-mail was never provided to them outside of this litigation. Def. Opp., D. 141 at 10 n.10.

counter NWMCC's "anticipate[d] . . . response to our argument").  Under these circumstances, the opinion letter and the informal clarification email should be accorded less weight than to the Department's previous interpretation of the prevailing wage classifications.  Mullally, 452 Mass. at 533 & n.13 (noting in a case involving Department opinion letters issued in the midst of litigation between two private parties that "[a]n administrative interpretation developed during, or shortly before, the litigation in question is entitled to less weight than that of a long-standing administrative interpretation of administrative rules") (citations omitted).

Finally, even if this opinion letter was determinative, the Court notes the inequity and comity concerns implicated by Plaintiffs' argument that the opinion letter be applied retroactively to contracts formed earlier than the date of the opinion letter.  See Pl. Opp., D. 136 at 18-19.  Such a holding would permit an end-run around the statutory process; a party unhappy with the prevailing wage schedule that is published when a job is announced for bidding could avoid the procedure specified by Mass. Gen. L. c. 149, § 27A to appeal the Department's decision within five days and instead make an ex parte request for an opinion letter—potentially years later—to use as support in a federal lawsuit.  Such a process avoids both the statutory "public hearing" requirement and the timeframe for seeking administrative review of wage schedules and prevents further certiorari review of the matter by a state court.  Cf. Teamsters Joint Council No. 10, 447 Mass. at 104-06 (reviewing on certiorari a decision issued by the Department pursuant to § 27A); see also Constr. Indus. of Mass., 406 Mass. at 173 (observing that "General Laws c. 149, § 27A provides an administrative mechanism for review of wage determination and classification of employment by the commissioner"); Commonwealth v. Diversified Contracting, Inc., 53 Mass. App. Ct. 1111, 2002 WL 27588, at *4 (Mass. App. Ct. Jan. 9, 2002) (unpublished) (opining that "[t]he defendant laments that . . . job designations

remain unduly vague. . . . Where difficulty arises, a § 27A appeal lies to the Commissioner for public hearing and decision").  Though the Plaintiffs are insistent that the Defendants should be liable for any consequences of not seeking § 27A review as to prevailing wage schedules applicable to contracts entered into as early as 2006, D. 136 at 18-19; D. 143 at 13-15, the statute's review process applies with equal force to affected members of labor organizations as it does to affected employers.  Mass. Gen. L. c. 149, § 27A.[13]

Finally, both the Plaintiffs and the Defendants disagree about the characteristics of catch basin cleaning trucks and whether the trucks should be characterized as "clamshell" equipment.  See, e.g., D. 142 ¶¶ 9, 11.  Similarly, there is evidence in the record that NWMCC employees referred to the catch basin cleaning trucks as "clamshell" trucks and the Plaintiffs use this moniker in their filings.  D. 142 ¶¶ 4, 6; D. 125 at 19; D. 164 at 5 (collecting references).  Neither of these issues present genuine disputes of material fact, where the relevant question is what the Department considered to be the correct prevailing wage rate as a matter of law pursuant to its statutory authority under Mass. Gen. L. c. 149, § 27F.  For all of these reasons, the Court holds that the minimum applicable rate of payment to workers cleaning catch basins using catch basin trucks is "vac haul/catch basin cleaning" (or where the rate for "catch basin cleaning" is not listed, "laborer") in accordance with the terms above.[14]

---

[13] An "employee claiming to be aggrieved by a violation of [§ 27F]" may institute an action under that section, and that is what the Plaintiffs have done here.  Mass. Gen. L. c. 149, §§ 27F.  But here, even assuming the opinion letter was determinative, which is a conclusion this Court has rejected above, to rule as Plaintiffs request that "[t]he [Department's] 2010 opinion . . . must be applied retroactively to December 7, 2006" would effectively apply the Department's prevailing wage opinion to the period four years before that opinion had been formed and would enforce a decision that would not in those years have been established as a matter of law.

[14] The Court places no reliance on either the affidavits of Jonathan Reynolds (discussing collective bargaining session notes, see D. 139 at 1-2) or William S. Owen (discussing complexity of catch basin cleaning equipment at 1-2, see D. 140) in reaching its decision.  The

C.      **Travel Time and Prevailing Wage**

The Plaintiffs also move for summary judgment that the Defendants are required to pay prevailing wage rates during the time their workers drive their trucks between catch basins and to and from municipal dumps.  D. 125 at 2.  The Defendants cross-move for summary judgment that travel time at the beginning and end of the workday, "between job sites" including "between catch basins" and time spent driving to waste collection facilities is not subject to prevailing wage rules.  D. 123 at 2.  The Court concludes that time spent driving between catch basins and to and from waste collection facilities is subject to the prevailing wage laws.

In arguing that "drive time" between catch basins and to and from dumps should not be compensable at prevailing wage rates, the Defendants rely heavily on Teamsters Joint Council No. 10, 447 Mass. at 100.  In that case, the Supreme Judicial Court deferred to a ruling by the Department that "over-the-road hours of teamsters who haul bituminous or ready-mix concrete" did not fall within the scope of the prevailing wage laws, where "[a]ny regulation of the wages of off-site workers, except drivers who haul gravel or fill, is an expansion of [§ 27]'s applicability beyond its clearly stated scope."  Id. at 104-05.  The Supreme Judicial Court did "not impose [its] own judgment where [the Department's] interpretation of a statute [was] reasonable."  Id. at 110.  The Department based its decision on its interpretation of Mass. Gen. L. c. 149, § 27 and not § 27F.  Teamsters Joint Council No. 10, 447 Mass. at 105 (noting the Department's reliance on language quoted from § 27).  Mass. Gen. L. c. 149, § 27 is focused on "contract[s] for the construction of public works" whereas § 27F more broadly covers any "arrangement . . . under which a truck or any automotive or other vehicle or equipment is to be engaged in public works." The Department's reasoning upheld in Teamsters Joint Council No. 10 was grounded in the

Court therefore denies as moot the Plaintiffs' motions to strike portions of those affidavits, D. 139 and D. 140.

specific language in § 27 and on the principle that "a statutory expression of one thing is an implied exclusion of other things omitted from the statute."  Id. at 110 (quoting Harborview Residents' Comm., Inc. v. Quincy Hous. Auth., 368 Mass. 425, 432 (1975)).[15]  The Department "noted that G.L. c. 149, § 27 contained a single specific exception for individuals who transport 'gravel or fill to the site of said public works or remov[e] gravel or fill from such site.' . . . [T]he deputy director concluded that the Legislature intended that only haulers of gravel and fill would be covered for road time."  No such language or limitation is present in § 27F, and, therefore, the Supreme Judicial Court's reasoning and ruling in Teamsters Joint Council No. 10 does not persuasively aid the Defendants' position here as to § 27F.

The Defendants also cite a 2004 Department Opinion Letter, PW-2004-01-1.21.04 (January 21, 2004) (available at http://www.mass.gov/lwd/labor-standards/prevailing-wage-program/opinion-letters/2004/pw-2004-01-12104.html), that addressed whether "workers must be paid the state prevailing wage for certain work performed away from the construction site."  Id.  The workers in question were performing "water meter installation work in residential homes and other facilities."[16]  The Department concluded:

> The Massachusetts prevailing wage law applies to the construction of public works by the commonwealth, or by a county, town, authority or district.  G.L. c. 149, §§ 26, 27.  The term "construction" is defined, in pertinent part, as "additions

---

[15] In addition, "[t]he [Department] relied on the words in [§ 27] 'on said works,' 'upon [public works projects],' and 'on various types of public works.'"  Teamsters Joint Council No. 10, 447 Mass. at 110.  In contrast, § 27F is primarily directed at "arrangement[s]" where a "truck or . . . equipment is to be engaged in public works," Mass. Gen. L. c. 149, § 27F.  Where courts have long held that the types of works covered by § 27 and § 27F are different, see, e.g., Commonwealth v. W. Barrington Co., 5 Mass. App. Ct. 416, 420 (1977), it is not apparent that the argument relying on a fine parsing of the language of § 27 (with its focus on "construction") is applicable to § 27F.

[16] As the Department opinion letter noted, "[i]nstallation of water meters in public and private facilities for the purpose of measuring water consumption for consumer billing is considered construction of public works and subject to the state prevailing wage law."  PW-2004-01-1.21.04 at n.1.

to and alterations of public works." G.L. c. 149, § 27D.  The work you have
described - driving from site to site during the day, attending trainings or
meetings, or dropping off door knob notices - does not constitute an addition to or
alteration of a public work; therefore, prevailing wage is not required.

Id.  That opinion letter is distinguishable for the same reason that Teamsters Joint Council No. 10

is distinguishable; namely, the issue in the Department's opinion letter is whether the work was

"construction" under Mass. Gen. L. c. 149, § 27.  Id.  The Department concluded that the work

described was not "construction."  Id.  But in contrast, here the Plaintiffs allege that they are due

prevailing wages for the time spent driving in reliance not upon § 27, but instead upon § 27F.

Compl., D. 38 ¶¶ 1, 91.  Cf. W. Barrington Co., 5 Mass. App. Ct. 416, 420 (1977) (describing

how § 27F, unlike § 27, is not "limited [to] public works involving 'construction'").

     The essence of Defendants' argument is that only the actual time spent at a catch basin

location is a "public work" compensable at prevailing wage rates.  But catch basin cleaning work

is closer to work such as municipal waste disposal that courts have found to come within the

broad ambit of a "public work."  See Mullally v. Waste Mgmt. of Mass., Inc., 452 Mass. 526,

528-29 (2008) (citing Perlera v. Vining Disposal Serv., Inc., 47 Mass. App. Ct. 491, 496 (1999)

(holding that § 27F applies to persons operating garbage trucks)).  "The core concept of 'public

works,' in Massachusetts and elsewhere, is commonly expressed as involving the creation of

public improvements having a nexus to land, such as . . . sewerage . . . .  [but also] includes the

work of maintaining or repairing such facilities."  Perlera, 47 Mass. App. Ct. at 494.  Just like

waste disposal workers who drive from rubbish bin to rubbish bin, and use garbage trucks to

collect the garbage, the evidence here is that catch basin operators drive from catch basin to

catch basin (up to between 12 and 40 per day; see D. 137 ¶ 36 & Exh. 4 ¶ 6), and use trucks to

collect the debris.  The logical extrapolation from waste disposal prevailing wage case law

suggests that the time spent moving between catch basins should be covered as prevailing wage

time as well.  Further, courts have long applied § 27F to workers "engaged in public works" without further parsing working time.  See, e.g., Perlera, 47 Mass. App. Ct. at 494-95 (collecting cases and holding that § 27F applies to workers performing "refuse collection and disposal"); W. Barrington Co., 5 Mass. App. Ct. at 419-20 (holding that § 27F applies to persons operating street sweeping trucks).

Although not squarely addressed in prior Massachusetts appellate cases, a further implication is that driving between waste collection sites and to or from a dumping ground is prevailing wage work.  See, e.g., Perlera, 47 Mass. App. Ct. at 495 (noting "[t]he Legislature's broad use of "public works" to include refuse collection and disposal dat[ing] at least to . . . 1953") (emphasis added); Mullally, 452 Mass. at 529-31 (not addressing any difference in driving time versus collection time but rejecting "use of a base pay rate below the prevailing wage rate" albeit in context of minimum wage).  That logic applies with equal force here, and the Court holds that time spent driving to and from the dumping site is prevailing wage compensable time, where it is part of the job of cleaning catch basins.  See D. 137 ¶ 37 (stating the undisputed fact that "[a]n employee performing catch basin cleaning work will need to empty the body of the dump truck at a waste collection facility at least once during the day, and he may need to do so multiple times").  However, the Court agrees with the Defendants' argument, D. 127 at 20, that under the Department's prior opinion letters, any time spent driving to or from any site other than a catch basin or dumping ground (e.g., time spent driving to the first catch basin at the start of the day) is not compensable at prevailing wage rates.  See MW-2002-007 (March 7, 2002) (available at http://www.mass.gov/lwd/labor-standards/minimum-wage/opinion-letters/2002/ 030702-commuting-time.html) (stating that "[s]tart time, for purposes of paying employees prevailing wage, is the point at which the employee arrives at the public works site").

The Defendants suggest that certain facts warrant a finding that driving time is not prevailing wage time engaged in public works, including that there is no established "route" for catch basin cleaning work, D. 144 at 15, that NWMCC's contracts refer to the actual catch basins as the "work site," D. 127 at 20-21, and that NWMCC's contracts do not permit NWMCC from seeking additional payment from its clients for travel time "because of the sequence, separation or location of the work sites at which [it] will be required to work," D. 127 at 21. Similarly, the Plaintiffs cite the impracticality of recording their time in at least "39 separate increments" (as workers drive from catch basin to catch basin and then clean those basins) as a reason to find that driving time is time engaged in public works under § 27F. D. 136 at 3; D. 144 at 15 (disputing this assertion). None of these facts are material and do not compel a different outcome here. This Court finds no suggestion in prior case law that the presence or absence of any regular "routes" impacted the reasoning of prior prevailing wage decisions and that determination in any case is unrelated to whether "truck[s] . . . or equipment [are] to be engaged in public works." Mass. Gen. L. c. 149 § 27F. Nor does this Court see why the presence or absence of descriptive or restrictive language in private contracts, or any increased burdens in the frequency of recording types of working time, has played any role in prior cases' reasoning whether "truck[s] . . . or equipment [are] to be engaged in public works." Id. For all of these reasons, the Court finds that there is no genuine dispute of material fact and that as a matter of law the time Plaintiffs spent driving between catch basins and to and from waste collection facilities is subject to the prevailing wage laws.

## V. Conclusion

For the above reasons, as to the "prevailing wage schedule" issue, the Court GRANTS in part Plaintiffs' motion for partial summary judgment, D. 121, to the extent that Plaintiffs seek a

ruling affirming the relevance of existing prevailing wage schedules, but GRANTS in part the Defendants' motion for partial summary judgment, D. 123, to the extent that Defendants seek a determination "that the 'clamshell/slurry bucket' rate does not apply to work performed using a catch basin cleaning truck."   As a matter of law, (1) the minimum applicable rate of payment to workers cleaning catch basins using catch basin trucks on projects subject to prevailing wage schedules where there was no "catch basin cleaning" rate is "laborer"; (2) the minimum applicable rate of payment to workers cleaning catch basins using catch basin trucks on projects subject to prevailing wage schedules where there is a "catch basin cleaning" rate is "catch basin cleaning."   As to the "driving time" issue, the Court GRANTS in part Plaintiffs' motion for partial summary judgment, D. 121, to the extent that it seeks to establish that the time Plaintiffs spent driving between catch basins and to and from waste collection facilities is subject to the prevailing wage laws, and GRANTS in part Defendants' motion for partial summary judgment, D. 123, to the extent that Defendants sought a ruling that travel time at the beginning and end of the workday is not subject to prevailing wage rules.   The Court DENIES any requested relief that is not consistent with this Memorandum and Order.   The Court DENIES as moot the Plaintiffs' motion to strike certain affidavits, D. 139 and D. 140; see note 14, supra.

   **So Ordered.**

                                        /s/ Denise J. Casper
                                        United States District Judge